Revised December 9, 1998

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 97-50640
_____


UNITED STATES OF AMERICA,

                    Plaintiff-Appellee,

v.

BIVIAN VILLALOBOS, JR,

                    Defendant-Appellant.

_____

Appeal from the United States District Court
for the Western District of Texas
_____

November 19, 1998

Before KING, GARWOOD, and HIGGINBOTHAM, Circuit Judges.

KING, Circuit Judge:

     Defendant-Appellant Bivian Villalobos, Jr., appeals his conditional plea of guilty on the grounds that the district court erred in denying his motion to suppress evidence obtained as the result of an allegedly unconstitutional stop by a United States Border Patrol agent.  We affirm.

I.  FACTUAL AND PROCEDURAL BACKGROUND

     This case concerns a Border Patrol stop on Highway 67, which runs north from the Presidio, Texas port of entry to the United States to Shafter, Texas, a small ex-mining community, and then

to Marfa, Texas.  Two numbered roads intersect Highway 67.  Ranch Road 170 runs along the United States-Mexico border, intersecting Highway 67 at Presidio.  Ranch Road 169 intersects Highway 67 about seven miles south of Marfa.  The terrain from Presidio to Shafter consists of rugged desert and mountains; the thirty-odd miles from Shafter to Marfa are primarily rolling hills.  This area of far West Texas is occupied mainly by large ranches and is extremely sparsely populated.  Highway 67 is a known alien and drug trafficking route, especially late at night.

During the early morning hours of March 14, 1997, United States Border Patrol Agent Joe Threadgill was stationed at a Border Patrol checkpoint about fifty-nine miles north of the border and five miles south of Marfa, Texas, on Highway 67.  The checkpoint was closed at the time, but at about 1:15 a.m., Threadgill received a call from the Presidio port of entry informing him that a light blue Chrysler, with Texas license plate number 397XDL, had just entered the United States and "would be a good check for narcotics if it came north."[1] Threadgill radioed this information to Border Patrol Agent Rodney Hall, who was observing traffic on Highway 67 approximately

_____

[1]  This information had been entered into a database maintained by the El Paso Intelligence Center.  The agents later discovered that its source was an anonymous informant who, on January 22, 1997, tipped off a customs investigator that the Chrysler and three cars with Mexican license plates had made multiple narcotics smuggling trips across the border via ports of entry to the United States.

2

twelve to fifteen miles south of the Marfa checkpoint.  At about
2:20 a.m., Hall noticed two vehicles approaching his location.
Pulling out to the edge of the highway, he illuminated the first
vehicle with his headlights as it passed and noted that it
resembled the light blue Chrysler that Threadgill had described.
Hall was able to pull in behind the first car because the two
vehicles were traveling about a quarter of a mile apart, but as
soon as he did so, the second vehicle decelerated and fell back a
mile or more.

Hall verified that the license plate number of the first car
matched the number that Threadgill had relayed to him.  He also
advised Threadgill that he was following the Chrysler and that he
believed that the second vehicle was traveling with it.  Hall
testified at the suppression hearing that smugglers often used a
lead car-load car arrangement, in which two vehicles travel
together so that the first vehicle can drive ahead to serve as a
scout for the car carrying the contraband.  Upon hearing this
news, Threadgill left the checkpoint and drove south to meet
Hall, stopping at the intersection of Highway 67 and Ranch Road
169, about four miles south of the checkpoint.  Threadgill
illuminated the three vehicles with his headlights as they passed
and noticed that the third vehicle, the vehicle originally
following the Chrysler, was a "brown stake-bed Ford pickup"
truck.  He could not, however, see into the truck's cab because
the windows were darkly tinted.  Although he considered running a

3

vehicle registration check, he ultimately concluded that he would be unsuccessful because the truck had temporary paper tags.  Hall testified that the tags were "another indicator to us that something could possibly be wrong" because smugglers often use vehicles with temporary tags.  The agents then decided that they would pull over both vehicles when they reached the Marfa checkpoint.

Hall pulled over the Chrysler; Threadgill stopped the truck. Threadgill informed the driver of the truck, later identified as Bivian Villalobos, Jr., that he was an immigration officer and that he wanted to check the driver's citizenship.  Villalobos produced a driver's license, stated that he was a United States citizen, and, like the driver of the Chrysler, orally consented to a canine sniff of his vehicle.  The dog alerted to both vehicles, and although no drugs were found in the Chrysler, the agents discovered sixty bundles (about 133 pounds) of marijuana hidden in the frame of the truck.

Villalobos was charged with possession with intent to distribute marijuana, a violation of 21 U.S.C. § 841(a)(1).  At a pretrial suppression hearing, the district court concluded that the stop of the truck was supported by reasonable suspicion because of the time of night, the proximity of the two vehicles as they traveled on a highway known as an illegal alien and narcotic trafficking route, the truck's paper tags, and the very dark tint on the truck's windows.  Villalobos then entered a

4

conditional guilty plea, reserving his right to appeal the district court's denial of his motion to suppress.

## II.  STANDARD OF REVIEW

We review the district court's factual findings for clear error, viewing the evidence presented at a pretrial suppression hearing in the light most favorable to the prevailing party, in this case the government.  See United States v. Cardona, 955 F.2d 976, 977 (5th Cir. 1992).  We will not say that a finding is clearly erroneous unless we are left with the definite and firm conviction that a mistake has been committed.  See United States v. Casteneda, 951 F.2d 44, 47 (5th Cir. 1992) (citing United States v. Fernandez, 887 F.2d 564, 567 (5th Cir. 1989)).  We review de novo, however, conclusions of law derived from the district court's factual findings, such as the determination that reasonable suspicion justified the investigatory stop of Villalobos's vehicle.  See United States v. Inocencio, 40 F.3d 716, 721 (5th Cir. 1994) (citing Cardona, 955 F.2d at 977).

## III.  DISCUSSION

Under United States v. Brignoni-Ponce, 422 U.S. 873, 884 (1975), and United States v. Cortez, 449 U.S. 411, 421-22 (1981), Border Patrol agents on roving patrol may stop a vehicle only if they are aware of specific articulable facts, together with rational inferences from those facts, that reasonably warrant suspicion that that particular vehicle is involved in illegal activity.  The relevant factors include:  (1) the characteristics

5

of the area in which the agents encounter the vehicle; (2) the previous experience of the arresting agents with criminal activity; (3) the proximity of the area to the border; (4) the usual traffic patterns on the road in question; (5) information about recent illegal trafficking in aliens or narcotics in the area; (6) the appearance of the vehicle; (7) the behavior of the vehicle's driver; and (8) the number, appearance, and behavior of the passengers.  See Brignoni-Ponce, 422 U.S. at 884-85; United States v. Nichols, 142 F.3d 857, 865 (5th Cir. 1998) (quoting Inocencio, 40 F.3d at 722).  Reasonable suspicion is not limited to an analysis of any one factor.  See Inocencio, 40 F.3d at 722. Instead, since "reasonable suspicion" is a fact-intensive test, each case must be examined from the "totality of the circumstances known to the agent, and the agent's experience in evaluating such circumstances."  Casteneda, 951 F.2d at 47.

We first consider the characteristics of the area in which the agents encountered Villalobos's vehicle and the proximity of that area to the border.  The record shows that the area between Presidio and Marfa was both close to the border and frequented by border traffic.  Agent Threadgill testified that this region was a "border area," a description further borne out by the Border Patrol's decision to maintain a permanent checkpoint at Marfa. Moreover, the road on which Villalobos was driving led directly from the border and was intersected only by other roads leading to the border.  Villalobos was relatively close to the border

6

when Agent Hall first noticed him.  This court previously has determined that vehicles traveling more than fifty miles from the border usually are a "substantial distance" from the border.  See Inocencio, 40 F.3d at 722 n.7 (internal quotes omitted).  In this case, Villalobos's truck was about thirty-six miles from the border--well under the benchmark fifty miles--when Hall first spotted it.  Although the agents did not stop the truck until the Marfa checkpoint, more than fifty miles from the border, their uncontroverted testimony reveals that for safety reasons, they chose to wait until they reached a lighted area to investigate further.  In short, Villalobos was unquestionably traveling through an area heavily traversed by border traffic, even closer to the border than a checkpoint designed to intercept illegal international smuggling.

Nevertheless, Villalobos contends that the characteristics of the area do not support any inference that he was involved in illegal activity because he could have been returning from Big Bend National Park or traveling from one of the towns along Highway 67.  His first argument is unavailing, however, because Highway 67 is a substantial distance from the southwestern edge of the park.  The likelihood that a driver proceeding north on Highway 67 at 2:20 a.m. is a tourist returning from Big Bend is thus considerably lower here than in the cases Villalobos cites, which concern stops on Highways 118 and 385, routes that lead directly out of Big Bend.  See Rodriquez-Rivas, 151 F.3d at 378;

7

United States v. Jones, 149 F.3d 364, 366 (5th Cir. 1998); United States v. George, 567 F.2d 643, 644 (5th Cir. 1978); United States v. Frisbie, 550 F.2d 335, 336-37 (5th Cir. 1977). And the possibility that Villalobos could have been an innocent traveler from Presidio or Shafter does not negate the fact that the area through which he was driving was both very close to the border and very heavily traversed by border traffic.

The other Brignoni-Ponce factors also support the validity of the stop. First, the arresting agents' law enforcement background suggests that they were knowledgeable and experienced. Threadgill had been stationed in Marfa as a Border Patrol agent for more than twelve years and Hall for about fifteen months. Second, the usual traffic patterns on Highway 67 support the agents' suspicion of Villalobos's truck. Threadgill testified at the suppression hearing that in the early morning hours on Highway 67, he would see only one car every hour or hour and a half. Although traveling at an unusual time of day may not by itself give rise to reasonable suspicion, it is a permissible consideration. See United States v. Lujan-Miranda, 535 F.2d 327, 329 (5th Cir. 1976). Moreover, the agents, who were familiar with area residents, did not recognize Villalobos's truck as a local vehicle. Third, there was ample evidence that Highway 67 was a notorious smuggling route. Threadgill stated that smugglers had transported both narcotics and illegal aliens north on Highway 67 in the month prior to Villalobos's arrest and that

8

he normally apprehended aliens in the area from Presidio to Marfa at least once a week.

Fourth, the appearance of the truck was suspicious because it displayed only temporary fifteen-day tags rather than a permanent license plate. Agent Hall testified that this was "another indicator to us that something could possibly be wrong" because "smugglers tend to use vehicles that have temporary tags or license plates that are expired because they buy them off the lots, they don't have to pay insurance and they are planning on using them only once or twice." Villalobos contends that temporary tags cannot be suspicious given our refusal to find reasonable suspicion in Rodriquez-Rivas, where the vehicle stopped had no license plates at all. But while we acknowledged in Rodriquez-Rivas that "the absence of Texas license plates alone does not authorize a Border Patrol agent to stop a vehicle," 151 F.3d at 381, we also emphasized that "the lack of required vehicle tags is a factor to consider in determining the reasonableness of the stop . . . ." Id. This factor takes on increased significance where, as here, it is known to be a tactic employed by contraband traffickers to escape detection. Furthermore, while the truck's darkly tinted windows are not uncommon in southwest Texas, see United States v. Diaz, 977 F.2d 163, 165 n.5 (5th Cir. 1992), the extreme darkness of Villalobos's tint did not allay the other suspicious circumstances.

Finally, the behavior of the driver suggested that he might be involved in illegal activity.  First, Villalobos appeared to be traveling in a lead car-load car arrangement with the blue Chrysler; they were driving within a quarter-mile of each other at a time and in a place where it was unusual to see more than one car every hour to hour and a half.  Although observation of two cars in proximity on a sparsely traveled road does not itself justify a stop, it may raise an agent's suspicions.  See United States v. Saenz, 578 F.2d 643, 646-47 (5th Cir. 1978); United States v. Villarreal, 565 F.2d 932, 936 (5th Cir. 1978); United States v. Barnard, 553 F.2d 389, 392 (5th Cir. 1977).  Although Villalobos suggests that such a suspicion is unfounded absent some connection between the Chrysler and his truck, such as a CB radio hookup or similar license plates, we held in United States v. Inocencio, 40 F.3d 716, 720, 723 (5th Cir. 1994), that the lead car-load car inference was justified where two vehicles were traveling near each other in a sparsely populated area and one vehicle had been observed making u-turns in the area and driving up and down the highway.[2]  More important, there was "evidence to bolster the lead car-load car inference," Melendez-Gonzalez, 727 F.2d at 412, namely the tip that the Chrysler was likely to be

_____

[2]  Both the load car and the lead car apparently contained two-way radios, but Border Patrol agents apparently did not know of their existence before they stopped the first vehicle, the load car.  See Inocencio, 40 F.3d at 720-21.

10

smuggling drugs and the agents' knowledge that smugglers favored the lead car-load car arrangement.

Villalobos contends, however, that we cannot consider the tip about the Chrysler in evaluating whether there was reasonable suspicion justifying a stop of his truck. First, he claims that the tip, nearly two months old, was stale. We note, however, that the informant described a particular vehicle that had made multiple smuggling trips, thus warranting the presumption that it was engaged in continuous activity. Second, Villalobos argues that the tip could not contribute to the agents' reasonable suspicion calculus because it neither bore indicia of reliability nor contained enough detail to allow it to be independently corroborated by the agents. We disagree. The Supreme Court approved a vehicle stop based on an anonymous tip that the driver was carrying drugs in Alabama v. White, 496 U.S. 325 (1990), pointing out that the tip in that case was independently corroborated by the officers and contained a range of details relating not just to easily obtained facts and conditions existing at the time of the tip, but to future actions of third parties not easily predicted. See id. at 331-32. In White, an anonymous telephone informant told police that Vanessa White would leave a particular apartment at a given time in a brown Plymouth station wagon, carrying cocaine in her attaché case. See id. at 327. Officers waited outside the address given by the informant and followed a woman as she left in the specified car.

11

They stopped her just before she reached the motel. See id. The Supreme Court held that the fact that the woman left in the car described by the informant, within the time frame given by the informant,[3] and drove the most direct route to the motel constituted sufficient corroboration, even though the woman's name and exact address were not verified prior to the stop, she was empty-handed when she left the apartment, and the officers had no way of knowing whether she would turn in to the motel or pass it by. See id. at 331. Although the tip in this case is clearly less detailed than that in White, it was corroborated insofar as the Chrysler did come into the country via a port of entry from Mexico and travel along roads known for drug smuggling at a time when legitimate traffic was very rare. Cf. United States v. Lopez-Gonzalez, 916 F.2d 1011, 1014 (5th Cir. 1990) (finding corroboration when two vehicles matching the description given by an informant passed a Border Patrol agent at the specified time in the general location predicted by the tip). Although the informant in this case did not say when the Chrysler

---

[3] The Court acknowledged that the officer who received the tip testified that the informant gave a particular time that the woman would be leaving, but did not state what that time was. It noted, however, that after the call, the officer and his partner went to the apartment complex named in the tip and put it under surveillance. "Given the fact that the officers proceeded to the indicated address immediately after the call and that respondent emerged not too long thereafter, it appears from the record before us that respondent's departure from the building was within the timeframe predicted by the caller." White, 496 U.S. at 331.

12

would be traveling, as did the informants in <u>White</u> and <u>Lopez-Gonzalez</u>, he or she did claim that it was engaged in a continuous drug trafficking enterprise.  It thus appears to us that the Chrysler's trip, made less than two months later, was within the approximate timeframe implied in the tip.

Moreover, even assuming that the tip alone was too unreliable to justify a stop, it contributes, along with the other <u>Brignoni-Ponce</u> factors, to the agents' particularized suspicion of the truck.  The tip, taken in combination with the characteristics of the area, the time of day, the truck's appearance, and Villalobos's behavior, raised a suspicion that Villalobos, and not just any traveler along Highway 67 late at night, was engaged in wrongdoing.  This is the essence of our Fourth Amendment investigatory stop jurisprudence.  <u>See</u> <u>Cortez</u>, 449 U.S. at 417-18 ("Based upon that whole picture the detaining officers must have a particularized and objective basis for suspecting the particular person stopped of criminal activity.").

But Villalobos's suspicious behavior was not limited to traveling closely behind the truck.  He also decelerated noticeably when Agent Hall pulled in front of him, even though he had not been speeding.  Although Villalobos's counsel suggested at the suppression hearing that he could have been following the Chrysler for greater illumination or safety, he not only failed to take advantage of the increased light (and safety) from the law enforcement vehicle but fell back far enough to negate the

13

benefits of traveling with another car.  Villalobos argues, however, that his dropping back three-quarters of a mile after Agent Hall pulled in front of him cannot be a suspicious circumstance, because innocent individuals typically slow in the presence of a law enforcement vehicle.  The record does not show whether Agent Hall was driving a marked car; he refers only to his "patrol car" in his suppression hearing testimony.  If the vehicle was unmarked, Villalobos's behavior was certainly suspicious; an innocent individual likely would not have decelerated sharply and fallen three-quarters of a mile behind a civilian car where he had been following another automobile at a distance of only a quarter-mile.  Even if Hall's car was marked, however, Villalobos's behavior was unusual.  We have held that noticeable deceleration in the presence of a patrol car can contribute to reasonable suspicion, even though drivers often slow when they see law enforcement personnel.  Compare United States v. Lopez, 911 F.2d 1006, 1010 (5th Cir. 1990), with Diaz, 977 F.2d at 165.  Such deceleration may be additionally suspicious when the car was not speeding to begin with:  We emphasize that Diaz held that "there is nothing suspicious about a speeding car slowing down after a marked patrol unit turns to follow."  Id. (emphasis added).  The car in Diaz was traveling seventy-five miles an hour on a rainy night, whereas Villalobos's car was not speeding.  Moreover, even though the typical driver may slow at the sight of a law enforcement vehicle, Villalobos

14

dropped back a full mile or more.  While we recognize that deceleration is a common and often completely innocent response to the approach of a patrol car, we hold that it may be one factor contributing to the reasonable suspicion justifying a stop such as this one.

The district court correctly concluded that, under the totality of the circumstances, the agents had reasonable suspicion to stop Villalobos's truck.  Villalobos was traveling through a sparsely populated border region along a notorious smuggling route at a time of day preferred by smugglers.  He was driving a truck that experienced Border Patrol agents did not recognize as a local vehicle and that carried the temporary tags smugglers commonly use to avoid detection.  Most important, he appeared to be traveling in tandem, an arrangement favored by smugglers, with a car that an informant had stated frequently carried drugs across the border.  When a Border Patrol agent pulled in front of Villalobos, he slowed considerably and maintained three times the distance between his truck and the patrol car that he had kept up between himself and the Chrysler.  Given these facts, we cannot say that reasonable suspicion was lacking.  The Fourth Amendment seeks to prevent arbitrary police action, not to require absolute certainty before law enforcement officers may investigate.  See White, 496 U.S. at 330 (quoting United States v. Sokolow, 490 U.S. 1, 7 (1989)); Brignoni-Ponce, 422 U.S. at 878; United States v. Garza, 544 F.2d 222, 225 (5th

15

Cir. 1976).  The stop here was not merely the result of a lucky hunch; it was based on articulable factors indicating that illegal activity might be afoot.

## IV.  CONCLUSION

For the reasons above, we AFFIRM the judgment of the district court.