**UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

_____

**No. 98-50921**
_____

**UNITED STATES of AMERICA,**

**Plaintiff-Appellee,**

**versus**

**JAMIE CHACON MORALES,**

**Defendant-Appellant.**

_____

**Appeals from the United States District Court**
**for the Western District of Texas**

_____

October 4, 1999

Before DUHÉ, BARKSDALE and EMILIO M. GARZA, Circuit Judges.

RHESA HAWKINS BARKSDALE, Circuit Judge:

Having been convicted of conspiracy, and its corresponding substantive offense, for possession with intent to distribute marijuana, in violation of 21 U.S.C. §§ 846, 841(a)(1), the sole issue presented by Jamie Chachon Morales is whether, consistent with the Fourth Amendment, and based upon the totality of the circumstances, a Border Patrol Agent had the requisite reasonable suspicion, formed by articulable facts and rational inferences, to make an investigatory stop of Morales, far inland from the Mexican border. We **AFFIRM**.

I.

On 11 December 1997, Border Patrol Agent Bollier, a 28-year veteran, who was in charge of the Midland, Texas, Border Patrol station, stopped Morales on I-20, near Penwell, Texas,

approximately 150 miles north of the border.  After observing characteristics about Morales' pickup truck as it passed the Agent's parked vehicle (such as being heavily loaded and having a fiberglass cover over the bed of the truck), and then following Morales for five miles, the Agent made the investigatory stop, because, based upon his observations and inferences drawn from them, *all prompted by his extensive experience*, he suspected criminal activity.  After a brief conversation with Morales, the Agent received permission to search the truck; he found 1400 pounds of marijuana.

Morales' suppression motion, claiming a lack of reasonable suspicion for the stop, was denied after a hearing at which Agent Bollier testified.  Morales was convicted at a bench trial and sentenced, *inter alia*, to 68 months imprisonment.

## II.

For the sole investigatory stop issue, Morales concedes as true all of the facts underlying the suppression ruling; the stop-was-reasonable-ruling is reviewed *de novo*.  *E.g., **United States v. Villalobos,*** 161 F.3d 285, 288 (5th Cir. 1998).  Suppression hearing evidence is viewed in the light most favorable to the prevailing party.  ***Id.***

"An investigatory stop must be justified by some *objective* manifestation that the person stopped is, or is about to be, engaged in criminal activity."  ***United States v. Cortez***, 449 U.S. 411, 417 (1981) (emphasis added).  Accordingly, "officers on roving patrol may stop vehicles only if they are aware of specific

articulable facts, *together with rational inferences from those facts*, that *reasonably* warrant suspicion that the vehicles contain [, *inter alia*,] aliens who may be illegally in the country". ***United States v. Brignoni-Ponce***, 422 U.S. 873,884 (1975) (emphasis added); *see, e.g., **Cortez***, 449 U.S. at 417-18; ***Villalobos***, 161 F.3d at 288; ***United States v. Inocencio***, 40 F.3d 716, 722 (5th Cir. 1994).

Factors that may be considered in deciding whether to make an investigatory stop include, *but are not limited to*:  (1) "characteristics of the area in which [Agents] encounter a vehicle"; (2) "proximity to the border"; (3) "the usual patterns of traffic on the particular road"; (4) "previous experience with alien traffic"; (5) "information about recent illegal border crossings in the area", or other criminal activity there; (6) "[t]he driver's behavior", such as "erratic driving or obvious attempts to evade officers"; (7) the type vehicle, or its other "[a]spects", such as types known to "officers ... [to be] frequently used for transporting concealed aliens"; (8) "[t]he vehicle may appear to be heavily loaded"; (9) "it may have an extraordinary number of passengers"; (10) they may be "trying to hide"; and (11) the officer may "recognize the characteristic appearance of persons who live" outside the United States, such as "in Mexico".  ***Brignoni-Ponce***, 422 U.S. at 884-85, as expanded by its progeny; *see, e.g., **Villalobos***, 161 F.3d at 288 (factors expanded to cover other types of criminal activity in addition to alien trafficking).

- 3 -

"*No single factor is determinative*; the totality of the particular circumstances must govern the reasonableness of any stop by roving border patrol officers." ***United States v. Moreno-Chaparro***, 180 F.3d 629, 631-32 (5th Cir. 1999) (emphasis added). "Obviously[,] only those factors known to the officer at the time of the stop can be considered when determining whether the stop was reasonable." ***Id***. at 632.

Of considerable importance to the case at hand is that, "[i]n all situations the officer is entitled to assess the facts in light of his experience in detecting illegal entry[,] ... smuggling", or other criminal activity. ***Brignoni-Ponce***, 422 U.S. at 885; *see, e.g.,* ***Cortez***, 449 U.S. at 418; ***United States v. Aldaco***, 168 F.3d 148, 151 (5th Cir. 1999); ***Villalobos***, 161 F.3d at 288.

Agent Bollier had 28-years experience interdicting, among other things, smugglers; he had handled hundreds of such cases. At the suppression hearing, based on this extensive experience, he articulated the numerous facts and corresponding inferences that prompted the investigatory stop.

The Agent testified that I-20 is "notorious for alien smuggling and narcotics". It has its western terminus at I-10, approximately 120 miles east of El Paso, Texas, and runs easterly cross-country through numerous heavily populated areas, including at least six with connecting north/south interstate highways: Dallas, Texas; Shreveport, Louisiana; Jackson, Mississippi; Birmingham, Alabama; Atlanta, Georgia; and Columbia, South Carolina (eastern terminus). I-10, the I-20 western terminus, runs through

El Paso, a heavily trafficked border crossing point. Moreover, southeast from El Paso for approximately 60 miles, I-10 runs very close to the border. And, the I-10 terminus for I-20, approximately 30 miles southwest of Pecos, Texas, is approximately 100 miles north of the border. That area of Texas south of the I-10/I-20 intersection, which includes Big Bend National Park on the border, is frequently (*and then some*) used for illegal trafficking of aliens and drugs.

In the past year alone, the Agent had detained approximately 600 illegal aliens on this stretch of the highway. For those instances, 15-20 aliens were usually found hidden in the back of a van or pickup truck.

The Agent was parked facing eastbound traffic (toward Dallas), where the highway had a series of bumps. He selected this spot in order to observe the reaction of vehicles driven over those bumps. A heavily loaded vehicle tended to keep bouncing or "floating" as it passed; Morales' pickup truck did so.

A similar factor, observed later by the Agent after he began following Morales, was that the tires on the pickup truck appeared to be underinflated. This condition usually results from a heavy load.

The pickup truck had a fiberglass cover over the truck bed. The Agent knew that smugglers use such cover to hide contraband. For example, based on his experience, persons could have been lying under it.

In addition, Morales did a "doubletake" when he passed the Agent's stationary, marked Border Patrol vehicle. Immediately thereafter, the pickup truck's motor sounds changed, indicating that the vehicle was slowing down.

The majority of the smuggling detected by the Agent occurred between 9:30-10:00 a.m. Morales passed by the Agent during that time period.

These observations and inferences caused Agent Bollier to follow Morales — the first vehicle the Agent followed that day. He had been parked by the side of the interstate, visible for about 200 yards, observing traffic since 8:00 a.m., and hundreds of vehicles had passed.

Upon reading Morales' license plate, Agent Bollier checked the vehicle registration. The registered owner was "E. J. Philips" from Dallas, Texas. The Agent thought Morales' Hispanic appearance was inconsistent with the non-Hispanic surname of the registered owner.

Additionally, Morales was paying more attention, through use of the rear view mirror, to Agent Bollier's vehicle than to the road, and was "weaving back and forth across the line". These factors further raised the Agent's level of suspicion that illegal activity was afoot.

It goes without saying that inland Border Patrol investigatory stops prompt frequent appeals to our court; each appeal is fact-specific in the extreme. In short, the **Brignoni-Ponce** factors, expanded and almost codified by its progeny, have been applied by

our court time ... and time ... and time again.  For example, the just rendered opinion in **United States v. Orozco**, 1999 WL 770848 (5th Cir. 29 Sept. 1999), concerns Agent Bollier discovering 730 pounds of marijuana in another pickup truck.

Frequent application of any rule of law, especially when the application is *not* based directly on the rule, but instead on another case, or other cases, applying it, can lead to blurring the rule's original clear message.  Accordingly, especially for fact-specific applications, it is helpful to return to original precedent; in this instance, **Cortez**:

> Courts have used a variety of terms to capture the elusive concept of what cause is sufficient to authorize police to stop a person.  Terms like "articulable reasons" and "founded suspicion" are not self-defining; they fall short of providing clear guidance dispositive of the myriad factual situations that arise.  *But the essence of all that has been written is that the totality of the circumstances-the whole picture-must be taken into account.*  Based upon that whole picture the detaining officers must have a particularized and objective basis for suspecting the particular person stopped of criminal activity.
>
> The idea that an assessment of the whole picture must yield a particularized suspicion contains two elements, each of which must be present before a stop is permissible.  First, the assessment must be based *upon all the circumstances*.  The analysis proceeds with various objective observations, information from police reports, if such are available, *and consideration of the modes or patterns of operation of certain kinds of lawbreakers. From these data, a trained officer draws inferences and makes deductions-inferences and deductions that might well elude an untrained person.*

> *The process does not deal with hard certainties, but with probabilities*. Long before the law of probabilities was articulated as such, practical people formulated certain common sense conclusions about human behavior; jurors as factfinders are permitted to do the same–and *so are law enforcement officers. Finally, the evidence thus collected must be seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement.*

> The second element contained in the idea that an assessment of the whole picture must yield a particularized suspicion is the concept that the process just described must raise a suspicion that the particular individual being stopped is engaged in wrongdoing. Chief Justice Warren, speaking for the Court in **Terry v. Ohio** ... said that "[t]his demand for specificity in the information upon which police action is predicated *is the central teaching of this Court's Fourth Amendment jurisprudence.*"

449 U.S. at 417-18 (citation omitted; emphasis added, except that concerning **Terry**).

In the light of controlling precedent applied to the facts observed and articulated by the Agent and the rational inferences he drew from those facts, there was reasonable suspicion to make the investigatory stop. Again, the standard is *not* whether any *one factor* is sufficient; instead, we consider the totality of the circumstances, based upon the officer's being "aware of specific articulable facts, together with [his] rational inferences from those facts". **Brignoni-Ponce**, 422 U.S. at 884.

Along this line, our court has often held that, for obvious reasons, the proximity of the stop to the border is the "paramount factor" to consider; and that this factor "is missing" if the stop

is, as here, more than 50 miles from the border. *Aldaco*, 168 F.3d at 150. In any event, Agent Bollier did *not* observe anything indicating that Morales' vehicle had come from Mexico. As discussed, his observations about many other factors, and the rational inferences he drew from them, more than satisfied the reasonable suspicion required by the Fourth Amendment.

For this "totality of the circumstances" approach, as *Cortez* emphasizes, the officer's experience is the obvious backdrop for those facts and inferences; that experience informs the "specific articulable facts" he observes, and the "rational inferences" he draws from them, in deciding whether to make the stop. In this regard, as *Cortez* reminds, a fact or event, unremarkable to an inexperienced officer, may well sound an alarm to an experienced one. For example, the Agent testified that, had the truck *not* appeared to have been so heavily loaded, he probably would *not* have stopped it.

Agent Bollier had 28-years experience as a Border Patrol Agent, involving hundreds of smuggling cases. Indeed, he had detained approximately 600 illegal aliens on this stretch of highway in the past year. The following colloquy from the Agent's suppression hearing testimony, concerning how he utilized the bumps in the highway as one means of looking for illegal activity, speaks volumes about his expertise in interdicting criminal activity:

> Q. Well, is there anything about this particular location near Penwell that makes it a good place for you to watch for smuggling activity?

A.   Yes.   In that area there's a -- a series of bumps in the highway and if a vehicle is loaded, you can usually spot it, you know, you can tell by the way the vehicle rides if it is loaded or not.

Q.   Okay.   Can you explain in a little more detail the significance of these bumps or --

A.   Well, when they hit the bumps the vehicle will float if it's heavily loaded.   It -- that's the only way I can explain it.   It floats.   It just keeps bouncing.

Q.   *And if it's not loaded, obviously it doesn't.*

A.   Yeah -- well, now, *we have encountered ways that they've tried to hide this.   They put 2X4s in the springs and so on and so forth.   But when they do that, the vehicle hits solid.   It doesn't bounce.*

(Emphasis added.)

Another example of the value of the Agent's experience concerns his suspicion about the fiberglass cover over the bed of the pickup truck; the cover was almost flush with the top of the sides around the bed.   Based on the Agent's experience, he knew that approximately 30 persons could be hidden under the cover, "[b]ecause [illegal aliens] weave themselves together, their legs around arms".

Agent Bollier's experience — his ability to be aware of "specific articulable facts" and to draw "rational inferences from those facts" — paid dividends; he was able to form the requisite reasonable suspicion — starting with the fact that the truck appeared to be heavily loaded — to make the investigatory stop.   As held by the able district judge, the stop was *not* violative of the Fourth Amendment.

- 10 -

## III.

For the foregoing reasons, the judgment is

**_AFFIRMED_**.