**UNITED STATES COURT OF APPEALS**
**For the Fifth Circuit**

_____

No. 99-40072
_____

United States of America,
Plaintiff-Appellee,

v.

Jose de Jesus Chavez-Chavez,
Defendant-Appellant.


_____

Appeal from the United States District Court
for the Southern District of Texas
_____


February 22, 2000

Before REYNALDO G. GARZA, JONES, and EMILIO M. GARZA, Circuit Judges.

REYNALDO G. GARZA, Circuit Judge:


FACTUAL AND PROCEDURAL HISTORY

On July 29, 1998, at approximately 8:00 in the morning, Border Patrol Agents Ron Torralba, an agent with six years experience, and Neil Heideman, an agent with three and a half years experience, stopped a van traveling on Highway 286 because they suspected that it contained illegal aliens. In fact, the van contained eight undocumented immigrants from Guatemala. Five were sitting in the van's front and rear seats, and three were not visible to anyone outside of the van. Chavez-Chavez (Chavez) was the driver of the van.

Highway 77 is a major highway leading from Brownsville, Texas to Corpus Christi, Texas.

Highway 286 is an alternate highway leading to Corpus Christi from the south.  Alien smugglers are known to use Highway 286 to circumvent the more heavily patrolled Highway 77.  The local Nueces County Sheriff[1] occasionally requests the Border Patrol's assistance with traffic stops on Highway 286 involving suspected illegal aliens.

After following the van in question for a mile or two, the agents stopped it on Highway 286 roughly 150 to 160 miles from the Texas-Mexico border and about 50 miles north from the Sarita Border Patrol checkpoint, which is on Highway 77.  Agent Heideman testified that it is common for illegal aliens to get out of their vehicles before the Sarita checkpoint, walk around it through the surrounding brush country, and meet their ride on the other side.  The agents also testified, however, that they had received no specific information that the van was carrying undocumented immigrants or that it had recently come from the border.

Agent Heideman testified that 8:00 a.m. is a common time for vehicles transporting illegal aliens to pass through that particular area of Highway 286.  He testified that as the van drove past the parked Border Patrol automobile, the driver of the van glanced back at the agents, and continued to look back at the agents several times as they followed the van.  Agent Heideman testified that the passengers appeared "very rigid" and that they looked straight forward and "appeared to be making an effort not to look anywhere else."  Agent Torralba testified that the passengers sat straight and that the four adults on the rear bench seemed uncomfortable, which the agents considered typical of smuggled illegal aliens.  However, the van was not speeding, and the passengers did not attempt to hide when the van passed the patrol car.

The agents testified that the van's suspension appeared rigid, which indicated that it had

---

[1]  Corpus Christi is located in Nueces County Texas.

been modified so that it would not appear low or weighted down. They testified that such a modified suspension was common in vehicles used to transport illegal aliens. The agents further testified that the passengers' clothes and the passengers themselves appeared very dirty and unkept.[2]

On October 1, 1998, after conducting a suppression hearing, the district court denied Chavez's motion to suppress evidence on the grounds that the initial stop had been supported by reasonable suspicion and did not violate the Fourth Amendment. The next day Chavez pled guilty to transporting illegal aliens in violation of 8 U.S.C. § 1324 (a)(1)(A)(ii) and (v)(II), but reserved the right to appeal the denial of his motion to suppress. The district court sentenced Chavez to fifteen months' imprisonment and a three-year supervised release term. This appeal followed.

DISCUSSION

Appellate courts review a district court's ruling that a stop was reasonable *de novo*. *See United States v. Morales*, 191 F.3d 602, 603 (5th Cir. 1999). Suppression hearing evidence is viewed in the light most favorable to the prevailing party. *See id.*

To temporarily detain a vehicle for investigatory purposes, a Border Patrol agent on roving patrol must be aware of "specific articulable facts" together with rational inferences from those facts, that warrant a reasonable suspicion that the vehicle is involved in illegal activities, such as transporting undocumented immigrants. *See United States v. Inocencio*, 40 F.3d 716, 722 (5th Cir. 1984); *see also United States v. Brignoni-Ponce*, 422 U.S. 873, 884 (1975). When

---

[2] The testimony of passengers in the van would later reveal that the illegal aliens' unclean appearance was the result of just having spent eight or nine days living in the brush, without bathing or changing clothes, waiting for their transportation to destinations further north.

deciding whether to make an investigatory stop, Border Patrol agents may consider several relevant factors, including: (1) characteristics of the area where the vehicle is encountered; (2) proximity to the border; (3) the usual traffic pattern on the road; (4) previous experience with criminal activity; (5) information about recent criminal activity in the area; (6) the driver's behavior; (7) the appearance of the vehicle, its type and whether it appears loaded; and (8) the number, appearance and behavior of the passengers. *United States v. Morales*, 191 F.3d 602, 604 (5th Cir. 1999); *Inocencio*, 40 F.3d at 722. No single factor is determinative; rather, this Court examines each case based on "the totality of the circumstances known to the agent, and the agent's experience in evaluating such circumstances." *Inocencio*, 40 F.3d at 722 (internal quotation and citation omitted).

Viewed in the light most favorable to the government, the totality of the circumstances supports a reasonable suspicion that the van in question was involved in alien smuggling. First, we consider characteristics of the area where the vehicle was encountered. Border Patrol Agents Torralba and Heideman, each with several years experience, were well aware that smugglers frequently use Highway 286 to circumvent the Sarita checkpoint and the more heavily patrolled Highway 77. Highway 286 is also legitimately used, however, by thousands of people who live in South Texas and travel to Corpus Christi, and the fact that a road has been used by alien smugglers is alone insufficient to justify a stop. *See United States v. Diaz*, 977 F.2d 163, 165 (5th Cir. 1992). Yet, that smugglers regularly use the road is relevant to the totality of the circumstances evaluation, especially given that local law enforcement officials have, on numerous occasions, requested assistance from Border Patrol Agents Torralba and Heideman in this area in pursuing suspected illegal aliens fleeing into the brush after a traffic stop.

Second, we examine the stop's proximity to the border. The stop occurred 150 to 160 miles north of the border, a substantial distance from the border. *See Inocencio*, 40 F.3d at 722 n.7. Thus, the proximity element is not present in this case. However, the author of *Inocencio* and the instant opinion did not contemplate establishing that any stop more than 50 miles from the border was illegal. In *Brignoni-Ponce*, 422 U.S. 873, the Supreme Court did not impose any such requirement. This court has noted that "if the agents do not base the stop on the vehicle's proximity to the border, *Brignoni-Ponce* may still be satisfied if other articulable facts warrant reasonable suspicion." *Inocencio*, 40 F.3d at 722 (internal citations omitted). That the proximity factor is not satisfied is alone not determinative. *See Morales*, 191 F.3d at 605 (holding that a stop by the Border Patrol was reasonable even though it occurred 150 miles from the border because other factors, when considered in their totality, justified reasonable suspicion to stop).

Third, we turn our attention to the usual traffic patterns on Highway 286. The agents testified that illegal aliens often travel north on Highway 286 at 8:00 a.m., the approximate time of the stop at issue. Traveling on Highway 286 at 8:00 in the morning by itself is not unusual, however, as many law-abiding people do so daily. A factual condition that is consistent with alien smuggling does not provide reasonable suspicion if that condition also occurs even more frequently in the law-abiding public. *See United States v. Jones*, 149 F.3d 364, 369 (5th Cir. 1998). However, in combination with the dirty and unkept appearance of the passengers, the time of travel takes on greater significance. *See United States v. Garcia*, 732 F.2d 1221, 1224 (5th Cir. 1984) ("the lateness of the hour substantially reduces the likelihood that those individuals were returning from outdoor work."). The Border Patrol agents could have reasonably inferred from the early morning time of the traffic stop taken with the unclean appearance of the passengers in

the van, at least their appearance from the mid-chest up, that the passengers may have recently spent some time in the area's surrounding wilderness, as illegal aliens in that area often do.

Fourth, we evaluate the agents' previous knowledge and experience in dealing with criminal activity. "In all situations the officer is entitled to assess the facts in light of his experience in detecting illegal entry [,] . . . smuggling, or other criminal activity." *Morales*, 191 F.3d at 604 (quoting *Brignoni-Ponce*, 422 U.S. at 885). Mr. Torralba had been a Border Patrol Agent for six years, all of which had been spent patrolling this area of Highway 286. Mr. Heideman had been a Border Patrol Agent for three and a half years, fourteen months of which had been spent patrolling this area of Highway 286. During their time as agents, they had developed substantial experience in detaining illegal aliens on this stretch of highway. Such experience is of considerable importance in evaluating the totality of the circumstances in the instant case.

Fifth, we discuss relevant information about recent criminal activity in the area. The record does not reflect that the agents had any specific information connecting the van in question to recent criminal activity in this area. However, local law enforcement officials have, on a regular basis, requested assistance from Border Patrol Agents Torralba and Heideman in this area in pursuing suspected illegal aliens fleeing into the brush after a traffic stop.

Sixth, we consider the driver's behavior. The agents testified that Chavez, the driver, glanced back at them as the van drove past the parked Border Patrol vehicle. They testified that as they followed the van, the driver looked back at them in his side-view mirror and that Chavez appeared nervous, frequently looking back at them. Yet, the agents did not testify that Chavez was speeding, driving erratically, trying to evade the officers or violating any state traffic laws.

Whether a driver looks at an officer or not should not be accorded much weight. *See United States v. Moreno-Chapparro*, 180 F.3d 629, 632 ("we are persuaded in the ordinary case, whether a driver looks at an officer or fails to look at an officer, taken alone or in combination with other factors, should be accorded little weight.").

Seventh, we assess the appearance of the vehicle. It is the agents' experience that smugglers often carry illegal aliens in vans like the one stopped. *See Morales*, 191 F.3d at 604 (noting that Border Patrol agents usually found illegal aliens hidden in the back of a van or pickup truck). The agents testified that the van appeared to have a modified suspension to prevent it from sagging, which is common in vehicles used to transport illegal aliens. The rigid suspension would prevent the van from appearing weighted down even if it were carrying a heavy load of people or contraband. *See id.* (finding reasonable suspicion where a pickup truck appeared to be carrying a heavy load).

Finally, we examine the number, appearance and behavior of the passengers. Most suspiciously, the five adult passengers visible to the agents appeared dirty and disheveled, which has been considered reasonably suspicious in prior cases. *See Garcia*, 732 F.2d at 1224 ("[t]his Court . . . has relied upon an agent's observation . . . that the occupants of the vehicle were unwashed and unkept."). As discussed previously, the suspicion raised by the dirty appearance of the passengers is heightened given that the stop occurred at 8:00, decreasing the likelihood that they were returning from a day of outdoor labor. The agents also testified that the four passengers on the rear bench appeared rigid and uncomfortable, which the agents considered typical of smuggled aliens. However, this behavior might also be typical of any adults crowded on the rear bench, and does not carry as much weight as the dirty appearance of the occupants of

the van in combination with the morning hour of the stop.

The agents identified specific articulable facts to support their reasonable suspicion for the stop, most significantly the characteristics of the area of the stop, including the proximity to the Sarita checkpoint, the rigid suspension of the vehicle, the type of vehicle, the dirty appearance of the passengers, and the time of the stop. When viewed in the light most favorable to the government and in the context of the agents' previous knowledge and experience with alien smuggling cases in the area, these particular facts and inferences rationally drawn from them reasonably led the agents to suspect Chavez was transporting illegal aliens in his van.

CONCLUSION

Accordingly, this Court AFFIRMS the district court's denial of Chavez's motion to suppress evidence on the grounds that the initial stop had been supported by reasonable suspicion and did not violate the Fourth Amendment.