IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

---

No. 99-50156

---

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

EUGENIO ZAPATA-IBARRA,

Defendant-Appellant.

---

Appeal from the United States District Court
for the Western District of Texas

---

August 10, 2000

Before GARWOOD, WIENER, and DeMOSS, Circuit Judges.

WIENER, Circuit Judge, dissenting:

The majority opinion[1] classifies this South Texas Fourth Amendment vehicle stop case as a "close one" —— to which I would add "at best." The majority stacks one more opinion on the burgeoning body of jurisprudence that —— at least figuratively —— has engrafted onto the Fourth Amendment's proscription of unreasonable searches and seizures the caveat "except in proximity to our border with Mexico." I count the Fourth Amendment as hors de combat of the government's so-called War on Drugs and its

---

[1] U.S. v. Zapata-Ibarra, 212 F.3d 877 (5th Cir. 2000).

efforts to interdict illegal immigration, which together have produced a kind of public hysteria that has in turn impeded rational judgment and logic. We of the federal judiciary, who have already diluted the Fourth Amendment by sanctioning a growing number of exceptions to the warrant requirement and by increasingly substituting "reasonable suspicion" for "probable cause" in many warrantless searches or seizures, have now placed the Fourth Amendment's protection of "the people" from unreasonable searches and seizures into a state of suspended animation anywhere even remotely close to the Mexican border. Thus I see this "close one" as our court's re-affirmation that, when it comes to intercepting illegal drugs and aliens within 100 (or more!) miles of that border, the ends will justify the means: A vehicle stop anywhere within that zone will receive our hindsight benediction solely because the stop's search bore fruit.

Convinced that the fabric of our society suffers significantly more harm by sacrificing the right of all the people —— including those near the Mexican border —— to the constitutional protections of the Fourth Amendment than it gains from the apprehension of a few more illegal immigrants or narcotic traffickers and their contraband, I respectfully dissent.

The espionage hysteria that followed Pearl Harbor proved sufficiently contagious to infect even the Supreme Court —— indeed, even its staunchest defender of individual liberties, Justice Hugo Black —— producing the Court's approbation of the government's

2

shameful internment of thousands of Japanese Americans.[2]  To borrow from Justice Scalia,[3] I sense that history is likely to judge the judiciary's evisceration of the Fourth Amendment in the vicinity of the Mexican border as yet another jurisprudential nadir, joining Korematsu, Dred Scott,[4] and even Plessy[5] on the list of our most shameful failures to discharge our duty of defending constitutional civil liberties against the popular hue and cry that would have us abridge them.

Were it not for the compulsion to lament the losses of individual liberties that result from this emasculation of the Fourth Amendment, I would not write separately:  Dissenting solely to express disagreement with my colleagues' evaluation of the instant facts and their legal effects would be unjustified.  And I certainly do not write in criticism of the DEA, the Customs Service, or the Border Patrol in general or this case's individual agent in particular:  Quite to the contrary, I am embarrassed that the federal courts have forced the dedicated, at-risk officers of these agencies to engage in the charade of "articulating facts"

---

[2] Korematsu v. United States, 323 U.S. 214, 65 S.Ct. 193 (1944).

[3] See Stenberg v. Carhart, 120 S. Ct. 2597, 2621 (2000) (where Justice Scalia proclaims that he is "optimistic enough to believe that, one day, Stenberg v. Carhart will be assigned its rightful place in the history of this Court's jurisprudence beside Korematsu and Dred Scott").

[4] 19 How. (60 U.S.) 393 (1856).

[5] Plessy v. Ferguson, 163 U.S. 537 (1896).

3

just so that we can point to something as the underpinnings of our retrospective findings of "reasonable suspicion" when we uphold vehicle stops that otherwise offend the Fourth Amendment. It is we, not law enforcement, who have constructed the straw man of articulatable facts and we who then accept as justifiable suspicion virtually anything and everything thus articulated:

> The vehicle was suspiciously dirty and muddy,[6] or the vehicle was suspiciously squeaky-clean;[7] the driver was suspiciously dirty, shabbily dressed and unkept,[8] or the driver was too clean;[9] the vehicle was suspiciously traveling fast,[10] or was traveling suspiciously slow[11] (or even was traveling suspiciously at precisely the legal speed limit); the [old car, new car, big car, station wagon, camper, oilfield service truck, SUV, van][12] is the kind of

---

[6] See United States v. Carroll, 591 F.2d 1132, 1135 (5th Cir. 1979).

[7] See United States v. Nichols, 142 F.3d 857, 866 (5th Cir. 1998).

[8] See United States v. Salazar-Martinez, 710 F.2d 1087, 1088 (5th Cir. 1983).

[9] See United States v. Indocencio, 40 F.3d 716, 723 (5th Cir. 1994).

[10] See United States v. DeWitt, 569 F.2d 1338, 1339 (5th Cir. 1978) [Weak].

[11] See United States v. Garcia, 732 F.2d 1221, 1225 (5th Cir. 1984); Nichols, 142 F.3d at 866.

[12] See United States v. Brignoni-Ponce, 422 U.S. 873, 884-85, 95 S.Ct. 2574, 2582 (1974) (station wagon); United States v. Morales, 191 F.3d 602, 604 (5th Cir. 1999) (pickup truck with fiberglass cover); United States v. Gordon, 712 F.2d 110, 112-13 (5th Cir. 1983) (stake bed truck); Garcia, 732 F.2d 1221 at 1225 (camper); Salazar-Martinez, 710 F.2d at 1088 (luxury car); Indocencio, 40 F.3d at 723 (oil field vehicle).

4

vehicle typically used for smuggling aliens or drugs; the driver would not make eye contact with the agent,[13] or the driver made eye contact too readily; the driver appeared nervous[14] (or the driver even appeared too cool, calm, and collected); the time of day [early morning, mid-morning, late afternoon, early evening, late evening, middle of the night] is when "they" tend to smuggle contraband or aliens;[15] the vehicle was riding suspiciously low (overloaded),[16] or suspiciously high (equipped with heavy duty shocks and springs);[17] the passengers were slumped suspiciously in their seats, presumably to avoid detection,[18] or the passengers were sitting suspiciously ramrod-erect;[19] the vehicle suspiciously slowed when being overtaken by the patrol car traveling at a high rate of speed with its high-beam lights on,[20] or the vehicle suspiciously maintained its same speed and direction despite being overtaken by a patrol car traveling at a high speed with its high-beam lights on;[21] and on

---

[13] See United States v. Orozco, 191 F.3d 578, 582 (5th Cir. 1999); Nichols, 142 F.3d at 866.

[14] See United States v. Baynard, 553 F.2d 389, 392 (5th Cir. 1977).

[15] See Morales, 191 F.3d at 866 (9:30–10:00 am); Garcia, 732 F.2d at 1225 (11:30 p.m.).

[16] See United States v. Payne, 555 F.2d 475, 477 (5th Cir. 1977); Garcia, 732 F.2d at 1225.

[17] See United States v. Chavez-Chavez, 205 F.3d 145, 149 (5th Cir. 2000).

[18] See Orozco, 191 F.3d at 580.

[19] See Chavez-Chavez, 205 F.3d at 149 (giving factor only slight weight).

[20] See United States v. Samaguey, 180 F.3d 195, 198 (5th Cir. 1999); Morales, 191 F.3d at 604.

[21] Testimony of Agent Zertuchi in the instant case.

5

and on *ad nauseam*.

We of the judiciary should be the last to cast verbal stones at agents who proffer such facts in efforts to validate their roving patrol stops.  For it is we who have taught these same agents the bridge-table conventions to incant when challenged.

I find the instant facts disturbingly illustrative of how far we have gone.  I begin by emphasizing what is not part of the calculus in this case:  (1) The record does not contain testimony that the day, date, or time of this stop — approximately 9:30 p.m. on a Monday night in mid-February — was suspicious; (2) the physical condition of the van and its rate of speed were not remarkable in any way; (3) there had not been recent reports of smuggling activity on RR 2523; and (4) when the south-bound patrol car met and passed the van from the opposite direction while both vehicles were traveling at highway speeds, the agent was not able to determine either the ethnicity or the number of the van's occupants — he testified, in fact, that he was unable to make such determinations under those conditions.

Then there are the five articulated "facts" that were credited by the district court in holding that the agent had "reasonable suspicion" to stop the van:  (1) The agent's experience (ten years); (2) the van's direction of northerly travel some 24 miles from the border; (3) the van's registration (San Angelo, Texas) coupled with its traveling on a route other than the most direct path back to its city of registration; (4) the presence of five

6

persons in the van; and (5) the "slumping" of the passengers. In contrast to the district court, the panel majority in its de novo review reiterates the eight Orozco factors,[22] but credits only (1) the van's 24-mile proximity to the border, (2) characteristics of the road (ranch road) and the direction being traveled by the van (north), (3) the road's usual traffic patterns (lightly traveled but used from time to time by smugglers), (4) the agent's experience (ten years), and (5) the slumping of some of the passengers (expressly credited by the panel majority only to the slightest degree). Differing with the district court, the panel majority did not find any significance in (1) the number of passengers (even a mini-van seats seven and a standard van seats nine or more, but only five persons occupied the blue van in question), or (2) the passengers' personal appearances (which the agent could not discern before making the stop). More significantly, the panel majority found no support in this case from the Orozco factors of (1) recent illegal trafficking in the vicinity (the uncontradicted evidence was that none had been reported), (2) characteristics of the vehicle (none were suspicious — unless we count the agent's failure personally to recognize the van as belonging to one of the local ranchers), (3) the driver's handling of the van (which the panel majority found to be normal, natural, and unsuspicious under the circumstances), or (4)

---

[22] United States v. Orozco, 191 F.3d 576, 581 (5th Cir. 1999).

passengers slumping in their seats (recognized by the majority as common postures on rural road trips and thus given only the slightest credit).

I concede that, like it or not, we are now precedent-bound to credit proximity to the border because our jurisprudence is constant on that being a "paramount factor" (which in turn, I submit, makes it the prime source of the lamentable "border exception" to the Fourth Amendment). Precedent also requires us to take into account the road's general reputation among knowledgeable agents for being a smugglers' route, used more frequently when the checkpoint on the main highway is open. I hasten to add, however, that in so doing we commit error frequently —— as does the panel majority here —— by confusing this justification for the <u>presence</u> of the roving patrol on that road with justification for the agent's making this <u>particular</u> stop of this <u>particular</u> vehicle: The facts that (a) the checkpoint was open on Route 277, and (b) RR 2523 is known by experienced agents to be a route used to bypass that checkpoint, <u>do</u> justify the presence of the roving patrol on this ranch road on the day in question; however, those facts contribute nothing to the reasonableness of the agent's assertion of suspicion of this particular van. Alone, the van's mere presence on RR 2523 does not create or contribute to <u>reasonable</u> suspicion for stopping it.

All of this leads me to ask rhetorically why we do not just "fess up" and declare in full candor that, irrespective of the

8

Fourth Amendment, we empower all experienced law enforcement agents, while on roving patrol within X miles of the border, to stop any unrecognized vehicle traveling north on secondary roads like RR 2523, especially when the checkpoint on the area's principal highway is open?  I submit that this is precisely what we are telling the field agents, albeit indirectly through the thinly disguised shibboleth of "articularable facts," and that we add to this Wonderland analog our retrospective blessing as reasonable of any stop that has led to the discovery of drugs or illegal aliens in the detained vehicle.  Because, in actuality, a successful search is all that we now require to conclude in hindsight that the stop was legally reasonable, our trial courts in south and west Texas will likely never again encounter a legally "unreasonable" vehicle stop at a suppression hearing:  Stops that produce no contraband never make it to a suppression hearing, so only successful stops are heard —— and under the current state of our jurisprudence, any successful stop is a constitutional stop.

In response to the prosecutor's efforts to strengthen the instant case, the agent also articulated statistics, specifically a record of some 200 stops on RR 2523 that had produced 30 apprehensions.  Contrary to the government's contention of support, these statistics prove the unreasonableness of this whole Albigensian[23] approach:  Bragging about netting 30 apprehensions out

_____

[23]  History records that when, during the campaign to eliminate the anti-Rome heresy centered in the Albi region of southwestern

of 200 stops is analogous to a major league baseball player's bragging about a .150 batting average —— hardly an all-star performance.   More significant is what the agent and the panel majority leave unsaid, the obverse of their deduction:   These statistics really prove that 85% of the stops were mistakes!   In other words, 85% of the time law-abiding citizens were hassled —— inconvenienced, aggravated, frightened, and conceivably delayed for work or school or church or even made to miss airline flights, doctors' appointments, important business meetings, social or family functions, or the like —— for doing nothing more suspicious than traveling —— legally, legitimately, and entirely within their constitutional rights —— on a public road that happens to be used occasionally for illicit purposes.

Other than the agent's years of service, the northbound van's proximity to the border, and the road's general (but not recently reported) history of being used for illicit traffic, this leaves only the vehicle's licensure, i.e., being "registered out of San Angelo," as factual support for the panel majority's conclusion that the stop was reasonable.   I find the crediting of this "articularable fact" most disturbing:   What is it in law or in logic that says a Texas-licensed vehicle, traveling in Texas within 100 miles of Mexico, is per se suspicious any time it is <u>not</u> headed

France, the leader of the forces loyal to the Pope ordered his troops to slay the heretics, some soldiers inquired how they could distinguish the heretics from the faithful, whereupon the Cistercian abbot commanded, "Kill them all; God will know His own."

10

directly to or from its city of registration?  In answering my own rhetorical question with a resounding "nothing!", I find it a quintessential non sequitur to credit, as an element of reasonable suspicion (here, likely the deciding element), the fact that an otherwise unremarkable Texas-licensed vehicle, which is traveling within Texas and is headed away from the border but in some direction — any direction — other than the most direct route home.  For, in the absence of martial law, what logic says that in this democratic republic every motor vehicle must be headed directly to or from its city of registration if it is to avoid being deemed suspicious and thus subject to being pulled over summarily by law enforcement personnel, with all the invasiveness that attends such a stop?

I find inescapable the conclusion that the agent in this case was adjudged to have acted reasonably for Fourth Amendment purposes only because we of the federal judiciary have accepted the proposition that the mission of interdicting illegal aliens (or drugs) in proximity to the Mexican border justifies riding roughshod over the Fourth Amendment's guarantees.  Signing on to this inverted priority results in our permitting — nay, encouraging — agents on roving patrol to conduct warrantless searches, devoid of reasonable suspicion, much less probable cause.  How is this practice distinguishable from the former practice of Southern peace officers who randomly stopped black pedestrians to inquire, "Hey, boy, what are you doin' in this neighborhood?"  All

11

that we now require is that the agent play our parlor game and "articulate" to us virtually any set of facts as triggering suspicion in his mind.  That the facts thus articulated might be (and frequently are) wholly irrelevant, immaterial, and incompetent to support reasonable suspicion is no longer important to the courts or the law enforcement agencies in our self-orchestrated danse macabre.

In summary, I take but slight issue with my colleagues of the panel majority or with the agent who stopped Zapata-Ibarra. Rather, the bone I pick is with the judiciary as a whole for the part we have played and continue to play in rolling back the Fourth Amendment to points many miles this side of our border with Mexico.

Shame on us.  At least the war that prompted the Supreme Court that to condone the internment of Japanese Americans[24] was a full-fledged, Congressionally-declared, "shooting" war.  These are the reasons why I respectfully dissent.

---

[24]  See, e.g., Korematsu v. United States, 323 U.S. 214, 65 S.Ct. 193 (1944).

12