# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 14-50208

United States Court of Appeals
Fifth Circuit

**FILED**

August 14, 2015

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

Plaintiff–Appellee,

v.

LUIS GERARD CERVANTES, also known as Luis Gonzalez Cervantez-Martinez,

Defendant–Appellant.

Appeal from the United States District Court
for the Western District of Texas

Before SMITH, PRADO, and OWEN, Circuit Judges.

OWEN, Circuit Judge:

Luis Gerard Cervantes appeals his conviction on the ground that the Border Patrol agents who conducted the traffic stop that led to his arrest lacked reasonable suspicion and violated the Fourth Amendment. The district court denied Cervantes's motion to suppress. We affirm.

**I**

The relevant facts are not in dispute. On a Wednesday in early October, at approximately 8:30 a.m., Cervantes was driving a Chevrolet Trailblazer eastbound on Interstate 20 (I-20) near Odessa, Texas, with five passengers. That morning, Border Patrol Agents David Collier and Carlos Ramirez were

on roving patrol and had parked in the median of I-20 when Cervantes's vehicle passed them. Collier noticed that the Trailblazer was sagging in the rear or perhaps overloaded, and both agents noticed that the vehicle had multiple occupants. The agents decided to investigate further.

As the agents neared Cervantes, he switched from the left lane to the right lane and began traveling behind an eighteen-wheeler semi-truck that was being driven about ten to fifteen miles under the seventy-five-miles-per-hour speed limit. The agents considered this odd behavior because there were no vehicles in the left lane ahead of the Trailblazer when it slowed its speed and pulled behind the eighteen-wheeler. As the agents approached Cervantes's vehicle, they saw that a passenger was in the rear cargo area of the vehicle where there was no seat. They then checked the vehicle's records and learned that it was registered in Morton, Texas, a town north of Odessa. The agents drove their patrol car parallel to Cervantes's and observed that the rear passengers were "dirty" and did not appear to have shaved or bathed in several days, while the driver and front passenger appeared "clean." Ramirez also noticed that the rear passengers were wearing dirty jackets and heavy clothing while the front passenger and Cervantes were wearing short sleeves. The agents themselves were attired in short sleeves, which they considered appropriate for the weather that day. While driving next to Cervantes's vehicle, the agents honked six times. Cervantes did not respond to the honking but looked forward and kept his hands tightly on the steering wheel. Neither Cervantes nor his front-seat passenger looked in the direction of the agents' vehicle despite the agents' attempts to obtain their attention.

Collier and Ramirez conducted a traffic stop. As Officer Collier approached the Trailblazer, he saw burlap backpacks, one of which was torn, and he saw small brick bundles wrapped with brown tape. These bundles were consistent with the way in which illegal drugs were often packaged and

smuggled, and he believed the bundles contained marijuana. Ultimately, it was determined that approximately 170 pounds of marijuana in the backpacks that had been carried across the border by the rear passengers. Cervantes and all of the passengers were arrested and charged with aiding and abetting possession with intent to distribute marijuana.

Cervantes filed a motion to suppress alleging he was stopped without reasonable suspicion in violation of the Fourth Amendment. After a hearing, the district court denied the motion. Cervantes entered a conditional guilty plea and reserved his right to appeal the ruling on his motion to suppress. The district court sentenced Cervantes to fifty-one months in prison and three years of supervised release. Cervantes appeals the denial of his motion to suppress.

## II

In reviewing the district court's disposition of the motion to suppress, we review legal conclusions de novo, including the conclusion that Collier and Ramirez had reasonable suspicion to stop Cervantes, and factual findings for clear error.[1] We view the evidence presented at a pretrial hearing on a motion to suppress in "the light most favorable to the prevailing party," in this case the Government.[2]

## III

Border Patrol agents on roving patrol "may detain vehicles for investigation only if they are aware of specific, articulable facts, together with rational inferences from those facts, that reasonably warrant suspicion that

---

[1] *United States v. Garza*, 727 F.3d 436, 440 (5th Cir. 2013) (citing *United States v. Rangel-Portillo*, 586 F.3d 376, 379 (5th Cir. 2009) and *United States v. Rodriguez*, 564 F.3d 735, 740 (5th Cir. 2009)).

[2] *Rodriguez*, 564 F.3d at 740.

the vehicle is involved in illegal activities."[3]  We weigh the factors outlined by the Supreme Court in *Brignoni-Ponce*[4] to determine if reasonable suspicion existed to stop a vehicle in a border area.[5]  The factors that may be considered include:

> (1) the area's proximity to the border; (2) characteristics of the area; (3) usual traffic patterns; (4) the agents' experience in detecting illegal activity; (5) behavior of the driver; (6) particular aspects or characteristics of the vehicle; (7) information about recent illegal trafficking of aliens or narcotics in the area; and (8) the number of passengers and their appearance and behavior.[6]

We look to the totality of the circumstances, and not every factor must weigh in favor of reasonable suspicion for it to be present.[7]  "Factors that ordinarily constitute innocent behavior may provide a composite picture sufficient to raise reasonable suspicion in the minds of experienced officers."[8]

The Supreme Court has explained that evaluation of these "factors in isolation from each other does not take into account the 'totality of the circumstances,' as our cases have understood that phrase."[9]  The Supreme Court has rejected the proposition that if behavior was "itself readily

---

[3] *Garza*, 727 F.3d at 440 (quoting *United States v. Cardona*, 955 F.2d 976, 980 (5th Cir. 1992)) (internal quotation marks omitted).

[4] *United States v. Brignoni-Ponce*, 422 U.S. 873, 884-85 (1975).

[5] *Garza*, 727 F.3d at 440.

[6] *United States v. Soto*, 649 F.3d 406, 409 (5th Cir. 2011) (citing *United States v. Jacquinot*, 258 F.3d 423, 427 (5th Cir. 2001) (per curiam)).

[7] *Garza*, 727 F.3d at 440 (citing *United States v. Zapata-Ibarra*, 212 F.3d 877, 884 (5th Cir. 2000) and *United States v. Hernandez*, 477 F.3d 210, 213 (5th Cir. 2007)).

[8] *United States v. Olivares-Pacheco,* 633 F.3d 399, 402 (5th Cir. 2011) (internal quotation marks omitted) (quoting *Jacquinot*, 258 F.3d at 427-28).

[9] *United States v. Arvizu*, 534 U.S. 266, 274 (2002).

susceptible to an innocent explanation [the behavior] was entitled to 'no weight.'"[10]  The Supreme Court has observed that

> *Terry* . . . precludes this sort of divide-and-conquer analysis.  The officer in *Terry* observed the petitioner and his companions repeatedly walk back and forth, look into a store window, and confer with one another.  Although each of the series of acts was "perhaps innocent in itself," we held that, taken together, they "warranted further investigation."[11]

The Supreme Court held in *United States v. Sokolow* that factors which by themselves were "quite consistent with innocent travel" collectively amounted to reasonable suspicion.[12]

The agents encountered Cervantes's vehicle near Penwell, Texas, on I-20 traveling east toward Odessa.  In determining whether agents had reason to believe that the occupants of a vehicle had recently crossed the border, our court has said that proximity to the border is "a paramount factor in determining reasonable suspicion,"[13] and when a stop takes place more than fifty miles from the border, "we look at the remaining factors most carefully to ensure the stop complied with the . . . Fourth Amendment."[14]  The distance of this stop from the border between Mexico and the United States weighs against reasonable suspicion.

---

[10] *Id.*

[11] *Id.* (citing *Terry v. Ohio*, 392 U.S. 1, 9, 22 (1981)).

[12] 490 U.S. 1, 7-8 (1989).

[13] *United States v. Garza*, 727 F.3d 436, 441 (5th Cir. 2013) (quoting *United States v. Zapata-Ibarra*, 212 F.3d 877, 881 (5th Cir. 2000)) (internal quotation marks omitted); *see also id.* ("[T]his Court has repeatedly emphasized that one of the vital elements in the *Brignoni-Ponce* reasonable suspicion test is whether the agents had reason to believe that the vehicle in question had recently crossed the border." (alteration in original) (quoting *United States v. Melendez-Gonzalez*, 727 F.2d 407, 411 (5th Cir. 1984))).

[14] *United States v. Soto*, 649 F.3d 406, 410 (5th Cir. 2011) (quoting *United States v. Orozco*, 191 F.3d 578, 581 (5th Cir. 1999)) (internal quotation marks omitted).

No. 14-50208

That the stop occurred more than fifty miles from the border is not dispositive, however.[15]  We have said that "even where a vehicle is beyond the fifty mile benchmark, the fact that the northbound vehicle was traveling from the direction of the Mexico-United States border can be a legitimate factor when viewed in conjunction with other factors."[16]  There are other factors present in this case that support reasonable suspicion.

Though the point at which the vehicle was stopped was approximately 200 miles from the border between Mexico and Texas, the district court found that Interstate 20, on the west side of Odessa, where this stop occurred, "is well known for its prevalence of drug and alien smuggling."  The evidence in the record supports that finding.  In addition, Officer Collier testified that he had made more than 100 stops in the area west of Odessa on Interstate 20 that had resulted in discovering undocumented aliens and illegal drugs on "regular occasions."

Our court has also recognized that this portion of Interstate 20 is "a favored route for illegal alien smugglers."[17]  In another decision from this court, we recognized that there was evidence that the same location at which Cervantes was stopped, on Interstate 20 near Penwell, Texas, was "notorious for alien smuggling and narcotics."[18]

---

[15] *See United States v. Varela-Andujo*, 746 F.2d 1046, 1047 (5th Cir. 1984) (determining reasonable suspicion existed even though the stop occurred over 170 miles from the Mexican border); *United States v. Salazar-Martinez*, 710 F.2d 1087, 1088 (5th Cir. 1983) (determining reasonable suspicion existed even though the stop occurred 165 miles from the Texas-Mexico border).

[16] *Soto*, 649 F.3d at 410.

[17] *Orozco*, 191 F.3d at 582; *see also Unites States v. Puac-Zamora*, 56 F.3d 1385, 1385 (5th Cir. 1995) (per curiam) (unpublished but precedential under 5TH CIR. R. 47.5).

[18] *United States v. Morales*, 191 F.3d 602, 604 (5th Cir. 1999).

No. 14-50208

In *United States v. Orozco* and *United States v. Morales*, this court determined that reasonable suspicion existed for stops on I-20 near Penwell, Texas, where Cervantes was stopped. In *Orozco*, the driver was traveling eastbound on I-20 at about 9:30 a.m. on a Sunday in a pick-up truck.[19] Orozco, the front passenger, was slumped over, and the driver was looking straight ahead.[20] The bed of the truck was covered with a blue tarp.[21] The truck was riding low and weaving back and forth on the road.[22] The agent began following the truck, pulled up next to the truck, and honked his horn.[23] The driver did not look at the agent, although the agent was not sure if the driver heard the honking.[24] The agent noticed that the spare tire was in the backseat with a jacket draped over it, which indicated to the agent that there was something in the truck bed.[25] The agent testified that "he had stopped numerous loads of aliens on that stretch of road, generally between 9:00 and 10:00 in the morning."[26]

The *Orozco* court stated that because the stop took place between 200-300 miles from the border, the proximity factor did not "cut[] in favor of a finding of reasonable suspicion."[27] However, other factors weighed in favor of reasonable suspicion: (1) the area of I-20 was known for smuggling, and the agent "had personally captured approximately 20 loads of aliens in the same

---

[19] *Orozco*, 191 F.3d at 579-80.

[20] *Id.* at 580.

[21] *Id.*

[22] *Id.*

[23] *Id.*

[24] *Id.* at 580 & n.2.

[25] *Id.* at 580.

[26] *Id.*

[27] *Id.* at 581.

No. 14-50208

area over the previous five month period";[28] (2) the agent testified that "the majority of smugglers passed through that particular stretch of I-20 on weekends between 9 and 10 a.m., the precise day and time in which Orozco's pickup was traveling," and Orozco was traveling eastbound, which was consistent with other smuggling loads;[29] and (3) the truck was heavily loaded and weaving; the truck bed was covered by a tarp, "a common technique employed by smugglers to hide illegal aliens," and the spare tire was in the back seat.[30] It is unclear how much weight the court gave to Orozco's behavior (slumping in his seat) or to the driver's failure to acknowledge the agent after he honked, but these factors were part of the court's analysis.[31] The court determined that, based on the totality of the circumstances, reasonable suspicion existed.[32]

In *Morales*, our court determined reasonable suspicion existed for a stop on I-20 near Penwell, Texas.[33] The court accorded weight in favor of reasonable suspicion to (1) the agent's 28 years of experience and the fact that "[i]n the past year alone, [he] had detained approximately 600 illegal aliens on this

---

[28] *Id.* at 582.

[29] *Id.*

[30] *Id.*

[31] *Id.* ("The trial judge noted that the 'driver's behavior' in addition to agent Bollier's observation that Orozco was 'trying to hide' were factors warranting Bollier's continual pursuit of the vehicle. Prior to stopping the truck, Bollier pulled next to the truck, rolled down his window to display his uniform and honked at the driver; however, this attempt to grab the driver's attention failed—yet another sign that something was amiss. We have held that while slouching, alone, may not be a significant factor we look to overall behavior of the vehicle driver. Moreover the avoidance of eye contact may or may not be entitled weight; and it is simply one factor to consider in observing overall behavior. Although some of the factors relied on by the trial judge would not alone amount to reasonable suspicion, reasonable suspicion determinations are not limited to analysis of one factor." (citations omitted)).

[32] *Id.* at 583.

[33] *United States v. Morales*, 191 F.3d 602, 603 (5th Cir. 1999).

stretch of the highway";[34] (2) the pick-up truck had underinflated tires and bounced as it passed over bumps in the road, indicating that it was heavily loaded;[35] and (3) the truck bed had a fiberglass cover.[36] The court mentioned the following facts, but it is unclear if the court gave weight to them: (1) "[t]he majority of the smuggling detected by the Agent occurred between 9:30-10:00 a.m.[, and the driver] passed by the Agent during that time period,"[37] and (2) the driver did a "doubletake" when he saw the agent's marked vehicle, slowed down, and after the agent started following him, weaved back and forth on the road.[38]

Based on the record in the present case, the factors other than proximity to the border weigh in favor of reasonable suspicion. Collier testified that Cervantes's vehicle appeared to be sagging in the rear, and in his experience, that is indicative of narcotics smuggling because smuggling vehicles usually have multiple occupants. While Collier acknowledged that the vehicle did not show any indication that it had recently "gone off road," and that he did not know if there was an alternative explanation for the vehicle riding low, such as the vehicle's shocks were worn, given Collier's field experience observing weighed-down vehicles, the fact that Cervantes's vehicle was riding sagging in the rear is part of the totality of the circumstances that gave rise to reasonable suspicion.[39]

---

[34] *Id.* at 604, 606.

[35] *Id.* at 605-07.

[36] *Id.* at 607.

[37] *Id.* at 605.

[38] *Id.*

[39] *See United States v. Brignoni-Ponce*, 422 U.S. 873, 885 (1975) (stating that whether a vehicle "appear[s] to be heavily loaded" is a factor to consider when determining reasonable suspicion); *United States v. Olivares-Pacheco*, 633 F.3d 399, 405 (5th Cir. 2011) (determining reasonable suspicion did not exist for stop in which vehicle was "neither over- nor under-loaded"); *United States v. Guerrero-Barajas*, 240 F.3d 428, 433 (5th Cir. 2001) (according

No. 14-50208

Collier testified that, by his estimate, when Cervantes passed the agents, Cervantes was traveling "at or approximately at highway speeds." As the agents neared Cervantes, although there were no vehicles in front of him or attempting to pass him, Cervantes quickly switched from the left lane to the right lane and pulled behind a semi-truck that was traveling about ten to fifteen miles under the speed limit. Collier stated that, while not illegal, this type of driving behavior was consistent with other smuggling loads he had seen, and it was particularly significant because Cervantes had time to pass the semi-truck but instead chose to follow very close behind it. While driving parallel to Cervantes's vehicle in their marked Border Patrol vehicle, the agents honked six times. Ramirez testified that Cervantes had to know they were Border Patrol agents because Cervantes had passed them when they were

---

some weight to the fact that the vehicle was "riding low"); *United States v. Ceniceros*, 204 F.3d 581, 585 (5th Cir. 2000) ("A vehicle's heavily-laden appearance may support a finding of reasonable suspicion and corroborate an informant's tip."); *United States v. Cardona*, 955 F.2d 976, 981 (5th Cir. 1992) (stating the fact that a vehicle is riding low "is a permissible factor for evaluation"); *United States v. Garcia*, 732 F.2d 1221, 1225 (5th Cir. 1984) (determining reasonable suspicion existed and according some weight to fact that "the camper appeared heavily loaded"); *United States v. Garza*, 544 F.2d 222, 224-25 (5th Cir. 1976) (per curiam) (determining reasonable suspicion existed for stop sixty-plus miles from the border in part because "the car appeared to be heavily loaded"); *United States v. Lara*, 517 F.2d 209, 210-11 (5th Cir. 1975) (determining reasonable suspicion existed for stop approximately two miles from the border in part because the "vehicle was riding low and appeared to be heavily loaded"); *cf. United States v. Moreno-Chaparro*, 180 F.3d 629, 632-33 (5th Cir. 1998) (determining reasonable suspicion did not exist for stop in part because "[t]he agent could not point to *anything* suspicious about the truck. It contained no visible passengers, it had not been modified in an obvious way, and it was not riding low to the ground"). *But see United States v. Melendez-Gonzalez*, 727 F.2d 407, 412 (5th Cir. 1984) ("[E]ven if relevant, the fact that defendant's car was supposedly 'riding low' has not been given determinative weight in border patrol cases." (footnote omitted)); *United States v. Orona-Sanchez*, 648 F.2d 1039, 1040, 1042 (5th Cir. Unit A 1981) (determining reasonable suspicion did not exist for stop on "lightly traveled state roadway" approximately fifty miles from the border when, among other things, the vehicle was heavily loaded, and the driver "slowed down considerably" and began driving "somewhat erratically"); *United States v. Pacheco*, 617 F.2d 84, 86 (5th Cir. 1980) (determining reasonable suspicion did not exist for stop and attributing "little weight" to fact that vehicle was riding low).

10

parked in the median.  During this time, Cervantes looked forward and kept his hands tightly on the steering wheel.

Collier stated that he had not used the honking technique many times before, so he did not opine as to whether it was normal for Cervantes to continue looking forward.  Collier conceded that it was safe for Cervantes to keep his eyes on the road, but Ramirez testified the lack of eye contact indicated to him that the occupants wanted to "shield the[m]selves from us." Collier further testified that while semi-trucks often travel below the speed limit, it was suspicious that Cervantes began traveling below the speed limit. Cervantes's decision to decelerate and pull behind the semi-truck as the agents neared his vehicle even though no other vehicles were near him[40] and his

---

[40] *See United States v. Neufeld-Neufeld*, 338 F.3d 374, 377, 382 (5th Cir. 2003) (according weight to the defendant's considerable deceleration after seeing the marked patrol car, and the defendant did not appear to be speeding beforehand); *United States v. Espinosa-Alvarado*, 302 F.3d 304, 306-07 (5th Cir. 2002) (per curiam) (according some weight to the driver's behavior in response to the agents' presence—"looking excessively in his mirrors and slowing the [vehicle] to 10 miles per hour below the speed limit"); *United States v. Jacquinot*, 258 F.3d 423, 429 (5th Cir. 2001) (per curiam) ("Although deceleration in the presence of a patrol car may be completely innocent behavior, this court has noted that such behavior may be suspicious if the driver was not speeding when first observed." (citing *United States v. Villalobos*, 161 F.3d 285, 291 (5th Cir. 1998))); *Guerrero-Barajas*, 240 F.3d at 433 (determining reasonable suspicion existed and according some weight to fact that "the driver slowed and began to swerve within his lane once the Agents began to follow him"); *United States v. Zapata-Ibarra*, 212 F.3d 877, 879, 882 (5th Cir. 2000) (determining reasonable suspicion existed in part because the defendant was initially traveling at the speed limit and "decelerated considerably" when the agent neared the defendant's vehicle); *Morales*, 191 F.3d at 605 (noting the defendant slowed down after passing by the marked patrol vehicle); *Villalobos*, 161 F.3d at 291 (determining reasonable suspicion existed for a stop in part because the vehicle "decelerated noticeably when Agent Hall pulled in front of [the driver], even though [the driver] had not been speeding" and "dropped back a full mile or more"); *Cardona*, 955 F.2d at 978, 981 (stating the defendant slowed down "considerably" after the agents began following him); *cf. United States v. Arvizu*, 534 U.S. 266, 275-76 (2002) (stating "a driver's slowing down, stiffening of posture, and failure to acknowledge a sighted law enforcement officer" may add to reasonable suspicion in some circumstances); *Zapata-Ibarra*, 212 F.3d at 882-83 ("[The driver's] deceleration and swerving on a [two-lane] road at nighttime, in response to a rapidly accelerating vehicle with its high-beam lights on, weighs, at best, only slightly in favor of the reasonableness of [the agent's] suspicions."); *United States v. Nichols*, 142 F.3d 857, 866, 868 (5th Cir. 1998) (taking into account fact that the driver "was traveling at an unusually slow speed"); *Garcia*, 732 F.2d at 1225 & n.4 (determining

No. 14-50208

failure to acknowledge the agents' presence after the honking[41] are entitled to

---

reasonable suspicion existed and according some weight to "the unusually slow speed of [the] vehicle," about forty to forty-five miles per hour on Interstate 35). *But see Ceniceros*, 204 F.3d at 583, 585 (determining reasonable suspicion existed and giving weight to the fact that the vehicle "drifted within its lane" but not to the fact that the vehicle's "speed fluctuated between 55 and 70 miles per hour"); *United States v. Chavez-Villareal*, 3 F.3d 124, 126-27 (5th Cir. 1993) (determining reasonable suspicion did not exist for stop roughly 350 miles from the border on Interstate 40: "We find nothing suspicious about a driver changing lanes and slowing down when he realizes a vehicle is approaching from the rear; that is a normal reaction if the driver wishes to let the tailing vehicle pass."); *United States v. Diaz*, 977 F.2d 163, 164-65 (5th Cir. 1992) (determining reasonable suspicion did not exist to stop vehicle that flashed high beams about twenty yards from the parked patrol vehicle and then "slowed from an estimated 75 to about 40 miles per hour" and specifically noting "there is nothing suspicious about a speeding car slowing down after a marked patrol unit turns to follow, with or without flashing lights.").

[41] *See United States v. Orozco*, 191 F.3d 578, 582 (5th Cir. 1999) (according, in case involving a stop on I-20 near Odessa, Texas, some weight to driver's attempt to hide and failure to acknowledge agent's presence after agent honked horn and noting "the avoidance of eye contact may or may not be entitled weight"); *see also Neufeld-Neufeld*, 338 F.3d at 382 (determining reasonable suspicion existed for stop on U.S. Highway 385 in Big Bend National Park in part because the driver "stared straight ahead" and "failed to acknowledge [the agent]"); *United States v. Aldaco*, 168 F.3d 148, 152 (5th Cir. 1999) ("The avoidance of eye contact may or may not be entitled weight; and it is simply one factor to consider in observing overall behavior."); *Nichols*, 142 F.3d at 864, 868 (noting that the avoidance of eye contact, by itself, is entitled to "no weight," but stating the driver Nichols's overall behavior "obviously adds to the reasonableness of the Border Patrol agents' suspicion. Nichols stopped at the intersection for a full twenty to thirty seconds. The Border Patrol vehicle was in plain view less than 15 feet away from Nichols's vehicle. A street light initially illuminated the Border Patrol vehicle, and the agents illuminated Nichols's truck with their headlights as Nichols approached the intersection. The Border patrol agents observed that, not only did Nichols avoid making eye contact, but he also did not even look in their direction when they illuminated their headlights, nor did he look in either direction down the road as if to see which way to go. Instead, Nichols simply stared straight ahead into the brush."). *But see United States v. Soto*, 649 F.3d 406, 411 (5th Cir. 2011) (attaching "little significance to the failure of the driver . . . to make eye contact with the agents while they drove beside her vehicle"); *Moreno-Chaparro*, 180 F.3d at 632 ("We are persuaded that in the ordinary case, whether a driver looks at an officer or fails to look at an officer, taken alone or in combination with other factors, should be accorded little weight. To conclude otherwise 'would put the officers in a classic heads I win, tails you lose position. The driver, of course, can only lose.'" (footnote omitted) (some internal quotation marks omitted) (quoting *United States v. Escamilla*, 560 F.2d 1229, 1233 (5th Cir. 1977))); *Chavez-Villareal*, 3 F.3d at 126-27 (determining reasonable suspicion did not exist for stop roughly 350 miles from the border on Interstate 40 in situation in which the driver "had a rigid demeanor and looked straight ahead"; after the agent began to follow the driver, the driver "began to change lanes and speeds, slowing down, then speeding up"; and the driver continued to look straight ahead despite the agent pulling up next to him); *Orona-Sanchez*, 648 F.2d at 1040, 1042

12

No. 14-50208

some weight in favor of reasonable suspicion.

In addition to Cervantes, there were five passengers in the Trailblazer: one in the front passenger seat, three in the back seat, and one in the rear cargo area. The passenger in the front seat was female, and the rest were males. The agents testified that it is not uncommon to see a vehicle with multiple occupants on I-20; however, multiple passengers were usually seen in vehicles that were used in an oilfield business. Those vehicles were usually flatbed, dually or pickup trucks, generally with lettering on the side, big diesel tanks, racks, tool boxes or brush guards attached. The Trailblazer, a small sport utility vehicle (SUV), had none of these features. While Ramirez agreed that if there were a fifth passenger in Cervantes's vehicle, the only space for him would be in the rear cargo area, the agents testified it is very uncommon to see a passenger in the cargo area of a passenger vehicle, such as a Trailblazer, where there is no seat or seatbelt. The agents further stated that such a seating arrangement is consistent with smuggling. Collier additionally testified that a vehicle with multiple occupants is typical for narcotics smuggling. While the fact that a vehicle had multiple occupants is not necessarily suspicious,[42] the travelers' positions in this vehicle are a consideration supporting the agents' stop of the vehicle.[43]

---

(determining reasonable suspicion did not exist for stop approximately fifty miles from the border when, among other things, the vehicle was heavily loaded, and the driver slowed down "considerably," avoided eye contact with agents, and began driving "somewhat erratically"); *Escamilla*, 560 F.2d at 1233 (stating that failure to acknowledge the agents' presence "cannot weigh in the balance in any way whatsoever").

[42] *See Olivares-Pacheco*, 633 F.3d at 405 (stating that six occupants in a truck is "neither illegal nor excessive").

[43] *See Zapata-Ibarra*, 212 F.3d at 883 ("We also consider relevant the number of passengers in the vehicle. [The agent] saw 'several passengers' in the van, and, although this number is not unusual for a van, it is also consistent with alien smuggling."); *cf. Soto*, 649 F.3d at 411 (noting that a car with two passengers was not unusual); *United States v. Chavez-Chavez*, 205 F.3d 145, 149 (5th Cir. 2000) ("Most suspiciously, the five adult passengers visible to the agents appeared dirty and disheveled . . . ."); *Morales*, 191 F.3d at 604 (noting

No. 14-50208

Regarding their appearance, the front passenger was wearing short sleeves and appeared "clean," while the rear passengers wore heavy clothing and jackets and appeared "dirty, [like] they just came off the brush."  The rear passengers appeared to have not bathed or shaved in several days.  It was 8:30 in the morning when the stop occurred and therefore unlikely that the rear passengers' appearance was due to working outdoors that day.  Ramirez stated that at the time of the stop, he was wearing short sleeves, and short sleeves were more appropriate for the temperature that day than the rear passengers' clothing.  He testified that immigrants who had been in the brush crossing the border often worn a jacket for protection against the brush and thorns and for warmth during the cool nights.  He had observed that type of dress on many occasions when undocumented aliens were encountered.  As to why the back passengers had jackets while inside the vehicle but the driver and front passenger did not, Ramirez agreed that individuals respond to temperature differently, and he did not know the temperature inside Cervantes's vehicle but expressed some doubt that there could be different temperatures of that magnitude in a small SUV.  He also testified that all the passengers appeared to be Hispanic.  The evidence regarding the rear passengers' attire in conjunction with the time of day and the noticeable difference in appearance and dress between the rear passengers and the front passenger are also part of the totality of the circumstances that gave rise to reasonable suspicion.[44]

---

that "an extraordinary number of passengers" is a factor to consider in deciding whether to make a traffic stop (quoting *Brignoni-Ponce*, 422 U.S. at 885)); *cf. Moreno-Chaparro*, 180 F.3d at 632-33 (determining reasonable suspicion did not exist for stop in part because "[t]he agent could not point to *anything* suspicious about the truck.  It contained no visible passengers, it had not been modified in an obvious way, and it was not riding low to the ground").

[44] *See Brignoni-Ponce*, 422 U.S. at 885 (noting, in its list of reasonable-suspicion factors, the Government's argument that "trained officers can recognize the characteristic appearance of persons who live in Mexico, relying on such factors as the mode of dress and haircut"); *Chavez-Chavez*, 205 F.3d at 147-50 ("Most suspiciously, the five adult passengers visible to the agents appeared dirty and disheveled, which has been considered reasonably

No. 14-50208

The agents testified that I-20 has "heavy traffic coming from the south" and that they patrol I-20 frequently based on their knowledge that "alien and narcotic loads are entering from the south and . . . [I-20]'s a good highway that leads up to Odessa and north." As we have noted, I-20's reputation as a smuggling route weighs in favor of reasonable suspicion.[45] Additionally, at the time of the suppression hearing, Collier had over sixteen years of experience as a Border Patrol agent, ten of which were spent in the Midland area, and Ramirez had eleven years of experience, three of which were spent in the Midland area. The agents testified that their main duty is traffic observation and that they often watch traffic on I-20. Their substantial experience is a

suspicious in prior cases. As discussed previously, the suspicion raised by the dirty appearance of the passengers is heightened given that the stop occurred at 8:00, decreasing the likelihood that they were returning from a day of outdoor labor." (citation omitted)); *see also United States v. Inocencio*, 40 F.3d 716, 720, 723 (5th Cir. 1994) ("[A]lthough [the driver] appeared to be dressed as a workman, his clothing appeared too clean to have been working in the field."); *Garcia*, 732 F.2d at 1222, 1224 (5th Cir. 1984) ("This Court also has relied upon an agent's observation, as was present here, that occupants of the vehicle were unwashed and unkempt," "a characteristic considered common to individuals who have recently spent time in the brush." "Moreover, the lateness of the hour substantially reduces the likelihood that those individuals were returning from outdoor work." (citation omitted)). *But see United States v. Jones*, 149 F.3d 364, 369 (5th Cir. 1998) ("A factual condition which is consistent with the smuggling of illegal aliens in a particular area, will not predicate reasonable suspicion, if that factual condition occurs even more frequently among the law abiding public in the area.").

[45] *See United States v. Garza*, 727 F.3d 436, 441 (5th Cir. 2013) ("The area's reputation as a smuggling route supports [the agent's] reasonable suspicion."); *United States v. Rico-Soto*, 690 F.3d 376, 380 (5th Cir. 2012) (determining that although the stop occurred approximately 450 miles from the border in Lake Charles, Louisiana, reasonable suspicion existed in part because the stop occurred on I-10, "a major alien-smuggling corridor"); *United States v. Rivera-Gonzalez*, 413 F. App'x 736, 739 (5th Cir. 2011) (giving weight to "the prevalence of drug and illegal alien smuggling on I-20 near Midland"); *Morales*, 191 F.3d at 604 (determining reasonable suspicion existed in part based on the agent's testimony that "I-20 is 'notorious for alien smuggling and narcotics.'"); *Orozco*, 191 F.3d at 582 ("Although the stop was not within fifty miles of the border, other facts existed indicating that the particular stretch of I-20 [fifteen miles from Odessa, Texas,] was a favored route for illegal alien smugglers."). *But see Olivares-Pacheco*, 633 F.3d at 401, 404 (according minimal to no weight to I-20's reputation as a smuggling route).

15

No. 14-50208

factor weighing in favor of reasonable suspicion, in light of what they observed.[46]

Cervantes points to other evidence that he contends require us to conclude that the agents had no reasonable suspicion when they stopped his Trailblazer. Collier testified that people drive to their jobs in Odessa in the mornings and that traffic is heavy at those times. The agents did not testify that this time or day of the week had any particular significance to them,[47] and there is nothing inherently unusual about traveling on a major thoroughfare on a weekday morning.[48]

Collier testified that Cervantes's vehicle was registered in Morton, Texas, approximately 135 miles north of Odessa. There are highways that connect Odessa to Morton. "A vehicle's registration may, under some

---

[46] *See Brignoni-Ponce*, 422 U.S. at 885 ("In all situations the officer is entitled to assess the facts in light of his experience in detecting illegal entry and smuggling."); *Garza*, 727 F.3d at 441-42 ("[A]n officer's experience is a contributing factor in determining whether reasonable suspicion exists." (internal quotation marks omitted) (quoting *Zapata-Ibarra*, 212 F.3d at 882)); *Rico-Soto*, 690 F.3d at 380 ("[The agent] has worked for the Border Patrol for 19 ½ years, ten of which were in Lake Charles. He has pulled over vans transporting illegal aliens in that area multiple times. His extensive experience allows him to recognize suspicious circumstances that less-familiar outside observers might never realize were noteworthy."); *Nichols*, 142 F.3d at 871 ("The interplay of the agents' past experience demonstrates the importance of viewing the factors in light of the totality of the circumstances.").

[47] *See, e.g.*, *Rico-Soto*, 690 F.3d at 380 (determining reasonable suspicion existed in part because "the van was traveling westbound through [the agent's] location in the mid-morning, the main time, route, and direction [the agent's] past experience has shown smugglers pass by through the area"); *Chavez-Chavez*, 205 F.3d at 148 (determining reasonable suspicion existed in part because "[t]he agents testified that illegal aliens often travel north on Highway 286 at 8:00 a.m., the approximate time of the stop at issue" and the occupants appeared "dirty and unkept").

[48] *Cf. Olivares-Pacheco*, 633 F.3d at 405 (determining reasonable suspicion did not exist for a stop made on I-20 near Odessa and labeling the time of the stop (10:30 a.m. on a Monday) "the most innocuous conceivable hour"); *United States v. Rangel-Portillo*, 586 F.3d 376, 382 (5th Cir. 2009) ("What is more indicative of a stop lacking in reasonable suspicion is . . . what is missing from the record. In the current case, . . . the time of the stop was not suspicious.").

16

circumstances, add to reasonable suspicion,"[49] and here, the facts were consistent with traveling to Morton.[50]  The agents also testified that the decision to pull Cervantes over was not based on a tip or information from an informant.  Although Collier had performed numerous traffic stops in the area, he could not recall exactly how many recent arrests he had made, and Ramirez stated that he could recall making one arrest in the months preceding Cervantes's arrest.  We have said that the lack of a tip or information about recent illegal trafficking in the area detracts from reasonable suspicion.[51]

The facts of the present case are similar, to some degree, to facts discussed in *United States v. Oliver-Pacheco*.[52]  In that case, the Fifth Circuit determined no reasonable suspicion existed.[53]  Like Cervantes, Olivares-

---

[49] *Olivares-Pacheco*, 633 F.3d at 404.

[50] *See Rico-Soto*, 690 F.3d at 381 ("[I]t is not unusual. . . for a car to be headed toward the city in which it is registered . . . . The fact that [the defendant] was driving on Interstate 10 alone would not be too helpful, because it is the most direct route back to Houston, where the van is registered."); *Olivares-Pacheco*, 633 F.3d at 404 (determining a vehicle's registration provided "minimal if any suspicion" when vehicle was stopped traveling east on I-20 near Odessa and was registered in the Dallas-Fort Worth area); *United States v. Soto*, 649 F.3d 406, 408-09, 411 (5th Cir. 2011) (determining reasonable suspicion existed to stop the defendant's vehicle on a weekday morning on Interstate 35 between Laredo and San Antonio, Texas, but giving no weight to the vehicle's registration in city in southeast Texas); *United States v. Espinosa-Alvarado*, 302 F.3d 304, 306 (5th Cir. 2002) (per curiam) (determining reasonable suspicion existed to stop defendant's vehicle less than one mile from the border and according some weight to the fact that the vehicle "was registered in New Mexico, but was over 45 miles from the New Mexico/Texas border on a work-day, driving east on a desolate stretch of Hwy 20 usually trafficked by local residents"); *United States v. Lopez*, 564 F.2d 710, 713 (5th Cir. 1977) ("[W]e view the fact that the car was old, with a large trunk and out-of-county license plates, as having only minor importance.  We would have thought it obvious that citizens may leave their state or county without having their purposes questioned. . . . We are a people on the move, and nary an eyebrow should be raised by seeing a Harris County license plate over 50 miles from our neighbor to the south.").

[51] *See Rangel-Portillo*, 586 F.3d at 382 ("What is more indicative of a stop lacking in reasonable suspicion is . . . what is missing from the record.  In the current case, . . . there is no evidence to indicate that the officer received a tip from an anonymous informant.").

[52] 633 F.3d 399 (5th Cir. 2011).

[53] *Id.* at 409.

Pacheco was traveling eastbound, in the right lane, on I-20 near Odessa, Texas, on a weekday morning (10:30 a.m.).[54] Cervantes drove a Trailblazer, an SUV, while Olivares-Pacheco drove an extended-cab pick-up truck.[55] Both vehicles were registered in another area of Texas accessible from I-20 or roads stemming from I-20.[56] Like Cervantes's vehicle, there were six occupants in Olivares-Pacheco's vehicle, but one of the passengers in Cervantes's vehicle traveled in the rear cargo area where there was no seat.[57] Also unlike Cervantes, who decelerated when the agents began catching up to him, Olivares-Pacheco drove at the speed limit.[58] Neither Cervantes nor Olivares-Pacheco engaged in erratic driving behavior.[59] Olivares-Pacheco's vehicle had brush underneath it, and Cervantes's vehicle appeared to be riding low.[60] In both situations, the drivers did not acknowledge the agents' presence when the agents pulled up next to their vehicles; in Cervantes's situation, the agents also honked multiple times.[61] One of the passengers in Olivares-Pacheco's vehicle pointed in the opposite direction of the agents, and the others looked that way.[62] The passengers in Cervantes's vehicle were dirty and wearing jackets, while the front passenger and Cervantes were clean and in short sleeves.

---

[54] *Id.* at 401.

[55] *Id.*

[56] *Id.*

[57] *Id.*

[58] *Id.* at 401, 405.

[59] *Id.*

[60] *Id.* at 401, 403.

[61] *Id.*

[62] *Id.*

No. 14-50208

In *Olivares-Pacheco*, this court determined reasonable suspicion did not exist for the stop. [63] The only factor the court considered as solidly weighing in favor of reasonable suspicion was the agents' extensive experience.[64] The differences between *Olivares-Pacheco* and the present case are that: (1) Cervantes changed lanes and decelerated; (2) the rear passengers in Cervantes's vehicle wore jackets, were dirty, appeared not to have shaven or bathed for days, and the time of the stop was inconsistent with returning from work; (3) one of the passengers was in the rear cargo area; (4) the agents honked at Cervantes, making his failure to acknowledge them more notable; and (5) Cervantes's vehicle was riding low. While there is conflicting case law, support can be found as to the relevance of each of these factors, with the exception of the fact that the passengers wore jackets.[65] Both of the agents who made the stop were experienced in apprehending alien smugglers, and the agents were personally familiar with the appearance of aliens who had

---

[63] *Id.* at 409 ("We are satisfied that, if we were to side with the government in this case and affirm the district court's denial of the defendant's motion to suppress, we would be doing so on the barest articulation of facts that we have ever credited as constituting reasonable suspicion. This we are unwilling to do.").

[64] *Id.* at 404.

[65] *See, e.g.*, *United States v. Neufeld-Neufeld*, 338 F.3d 374, 377, 382 (5th Cir. 2003) (according weight to the defendant's considerable deceleration after seeing the marked patrol car, and the defendant did not appear to be speeding beforehand); *United States v. Guerrero-Barajas*, 240 F.3d 428, 433 (5th Cir. 2001) (according some weigh to fact that the vehicle was "riding low"); *United States v. Orozco*, 191 F.3d 578, 582 (5th Cir. 1999) (according, in case involving a stop on I-20 near Odessa, Texas, some weight to driver's attempt to hide and failure to acknowledge agent's presence after agent honked horn and noting "the avoidance of eye contact may or may not be entitled weight"); *United States v. Zapata-Ibarra*, 212 F.3d 877, 883 (5th Cir. 2000) ("We also consider relevant the number of passengers in the vehicle. [The agent] saw 'several passengers' in the van, and, although this number is not unusual for a van, it is also consistent with alien smuggling."); *United States v. Chavez-Chavez*, 205 F.3d 145, 147-50 (5th Cir. 2000) ("Most suspiciously, the five adult passengers visible to the agents appeared dirty and disheveled, which has been considered reasonably suspicious in prior cases. As discussed previously, the suspicion raised by the dirty appearance of the passengers is heightened given that the stop occurred at 8:00, decreasing the likelihood that they were returning from a day of outdoor labor." (citation omitted)).

emerged from brushy areas after crossing the border, including the types of clothing typically worn. The agents testified that the appearance of the passengers in Cervantes's vehicle was entirely consistent with aliens who had crossed the border and traveled through the Texas brush. The experience of agents in circumstances such as these is entitled to weight.[66] There is evidence in the present case that was not presented in *Oliver-Pacheco*. We must consider the totality of the circumstances that faced Agents Collier and Ramirez.

Viewing the evidence in the light most favorable to the Government,[67] and considering the totality of the circumstances,[68] the agents had reasonable suspicion to stop Cervantes. The traffic stop did not violate the Fourth Amendment.

\*     \*     \*

For the aforementioned reasons, we AFFIRM the district court's judgment.

---

[66] *See, e.g., United States v. Arvizu*, 534 U.S. 266, 273-74 (2002) ("[O]fficers [may] draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'" (quoting *United States v. Cortez*, 449 U.S. 411, 418 (1981))); *id.* ("[A] reviewing court must give 'due weight' to factual inferences drawn by . . . local law enforcement officers." (citing *Ornelas v. United* States, 517 U.S. 690, 699 (1996))); *Orozco*, 191 F.3d at 581-82.

[67] *United States v. Rodriguez*, 564 F.3d 735, 740 (5th Cir. 2009).

[68] *United States v. Garza*, 727 F.3d 436, 440 (5th Cir. 2013).

No. 14-50208

EDWARD C. PRADO, Circuit Judge, dissenting:

Because this border-patrol stop occurred more than 200 miles from the U.S.–Mexico border based on little more than innocuous, safe, lawful driving behavior, I respectfully dissent. Cervantes was driving his five-seat Chevrolet Trailblazer SUV eastbound with five passengers at 8:30 a.m. on a Wednesday morning. When border patrol drove up behind him, he changed lanes from the left lane to the right line behind a slow-moving 18-wheel semi-truck. The SUV slowed to match the truck's speed. The border patrol agent then pulled up alongside the left side of Cervantes's SUV, boxing Cervantes in—with an 18-wheel truck in front of him, a border patrol car to his left, and the road shoulder to his right. The border patrol agent honked his horn, but Cervantes kept his eyes on the road. These facts—considered together as part of the totality of the circumstances and examined charily due to the substantial distance between the stop and the border—do not support reasonable suspicion that Cervantes had smuggled aliens or contraband across the U.S.–Mexico border.

We confronted a strikingly similar situation, and reached a conclusion opposite from the majority opinion, in a case involving a border-patrol stop of a vehicle that was also travelling eastbound on this very stretch of highway on a weekday morning. *United States v. Olivares–Pacheco*, 633 F.3d 399, 401 (5th Cir. 2011). We not only held that the stop was unconstitutional because the border patrol agents lacked reasonable suspicion, we also characterized the case as presenting "facts of an unprecedented suspicionless nature." *Id.* at 409. Because this case is materially indistinguishable from *Olivares–Pacheco*, I would hold that the agents lacked reasonable suspicion for the stop that resulted in Cervantes's conviction, and I would vacate his conviction and sentence.

21

No. 14-50208

As elaborated below, the majority opinion stumbles in two important respects. First, the opinion does not give the substantial 200-mile distance of the stop from the border the paramount weight this factor warrants under our case law. 200 miles is a substantial distance that significantly undercuts the vital element of the *Brignoni-Ponce* test: whether the car had come from the border. Second, the majority opinion attributes suspiciousness to safe driving in the circumstances.

## I.   PROXIMITY TO THE BORDER IS A PARAMOUNT FACTOR, AND 200 MILES FROM THE BORDER WEIGHS HEAVILY AGAINST REASONABLE SUSPICION

We weigh the eight factors outlined by the Supreme Court in *United States v. Brignoni-Ponce*, 422 U.S. 873 (1975) to determine if border patrol agents on roving patrol had reasonable suspicion to stop a vehicle. *United States v. Garza*, 727 F.3d 436, 443–44 (5th Cir. 2013), *cert. denied*, 134 S. Ct. 1346 (2014). These factors include:

(1) proximity to the border;

(2) known characteristics of the area in which the vehicle is encountered;

(3) usual traffic patterns on the particular road;

(4) the agent's previous experience in detecting illegal activity;

(5) information about recent illegal trafficking in aliens or narcotics in the area;

(6) particular aspects or characteristics of the vehicle;

(7) behavior of the driver; and

(8) the number, appearance, and behavior of the passengers.

*United States v. Zapata–Ibarra*, 212 F.3d 877, 881 (5th Cir. 2000) (citing *United States v. Orozco*, 191 F.3d 578, 581 (5th Cir. 1999)).

These factors are not entitled to equal weight. This Court has repeatedly

22

stated that "[t]he first factor, proximity to the border, is a 'paramount factor' in determining reasonable suspicion." *Orozco*, 191 F.3d at 581; *accord Garza*, 727 F.3d at 441; *Zapata–Ibarra*, 212 F.3d at 881. "[A] *vital* element of the *Brignoni-Ponce* test is whether the agent had 'reason to believe that the vehicle [in question] had *come from the border*.' '[T]his element [is] . . . missing where the stop has occurred a substantial distance from the border.'" *United States v. Garcia*, 732 F.2d 1221, 1223 (5th Cir. 1984) (second alteration in original) (emphasis added) (quoting *United States v. Lamas*, 608 F.2d 547, 549 (5th Cir. 1979)).

The "paramount" proximity-to-the-border factor weighs so heavily in the reasonable-suspicion analysis that, if the distance from the border is as substantial as in this case, we examine the remaining seven factors and the evidence charily, with skepticism toward the Government's justification for the stop. *See Olivares–Pacheco*, 633 F.3d at 409 ("Proximity to the border is a 'paramount factor,' and, again, we must look at the other evidence charily if such proximity is not present.").

The majority opinion errs by not giving this paramount factor the consideration it warrants under our case law. We have been skeptical toward border patrol agents' justification of reasonable suspicion this far from the border for good reason: Upholding a border-patrol stop on these facts—changing lanes behind a 18-wheel semi-truck, slowing to match that truck's speed, and not looking at a honking car to your left *this far from the border*—could subject millions of safe drivers to potential privacy intrusions.[1] Major

---

[1] The border patrol's own authorizing statute and regulations provide that "100 . . . miles from [the] external boundary of the United States" is a "reasonable distance" within which border patrol agents are authorized to conduct roving patrols to prevent illegal entry. 8 U.S.C. § 1357(a)(3) (authorizing border patrol agents to conduct roving patrols within a

cities that no one would consider "border cities," such as Los Angeles, San Antonio, and Phoenix are all closer to the U.S.–Mexico border than Penwell, Texas and this particular stretch of Interstate-20. The overwhelming majority of drivers headed eastbound on the Interstate in these metropolises have not crossed the U.S.–Mexico border during their journeys, and many—if not most—of these drivers have changed lanes behind a slow, 18-wheel semi-truck to allow a faster moving car to pass on the left.

## II. EXAMINING THE EVIDENCE AND REMAINING FACTORS CHARILY, AS WE MUST, THE OFFICERS LACKED REASONABLE SUSPICION TO STOP THE CAR

Examining the factors and evidence skeptically, I would hold that the border patrol agents lacked reasonable suspicion to stop the car. Cervantes was driving eastbound on Interstate-20. The officers checked the car's registration before stopping the car and determined that the car was registered in Morton, Texas. Thus, the direction that the car was travelling would have taken the car toward Morton, which is north of Odessa. This fact undercuts the agents' basis for the stop. *See Olivares–Pacheco*, 633 F.3d at 404–05 (rejecting the agents' justification in part because "the vehicle was registered . . . in the greater Dallas area, wholly consistent with the truck's direction"). Moreover, the stop occurred at about 8:30 a.m. on a Wednesday, not in the dark of night. This fact also cuts against reasonable suspicion. *See id.* at 405 (rejecting the agents' justification in part because the stop "occurred on a Monday at 10:30 A.M., not in the dark of night"). Cervantes's SUV also did not appear dirty or covered in brush—which would have been consistent with having "gone off road"—a fact that also weighs against suspicion.

---

"reasonable distance" of the border); 8 C.F.R. § 287.1(a)(2) (defining "reasonable distance" to mean 100 miles); *see also Brignoni–Ponce*, 422 U.S. at 877.

There are facts that support the border patrol agents' suspicion in this case as well. The agents testified that Cervantes's SUV was driving on an alien-smuggling route and appearing to carry a heavy load. The SUV contained one driver and five passengers, even though there were only enough seatbelts to accommodate one driver and four passengers (one passenger was seated in the cargo area). Four of the occupants appeared to be "dirty." From this, the experienced officers—Agent Collier has sixteen-plus years' experience as a border patrol agent, and Agent Ramirez has eleven-years' experience—suspected illegal alien smuggling.[2]

On balance, however, these facts and the totality of the circumstances do not establish reasonable suspicion. The most important factor—proximity to the border—weighs against reasonable suspicion because the stop occurred more than 200 miles from the border. *See Olivares–Pacheco*, 633 F.3d at 402, 409; *Orozco*, 191 F.3d at 581. Though we view the evidence in the light most favorable to the Government, we also must examine the remaining factors with skepticism this far from the border. *See Olivares–Pacheco*, 633 F.3d at 409. As elaborated below,[3] Cervantes's driving behavior was safe, not suspicious. He was driving toward the city in which the car was registered at 8:30 a.m. on a weekday morning. The SUV showed no indication of having recently driven off-road. Although the car appeared heavily loaded and had one more passenger than available seatbelts, travelling with multiple occupants in an SUV is not

---

[2] The Government also points to inconsistent attire as a factor supporting reasonable suspicion: the driver and front passenger wore short sleeves, whereas the rear passengers wore jackets. But there is no reason to believe that wearing jackets on an October morning near Odessa, Texas is suspicious. According to the *Farmer's Almanac*, the low temperature that day was 57 degrees. Common sense dictates that some passengers in the back wearing jackets—as opposed to passengers wearing short sleeves in the front of the vehicle—on a fall morning at 8:30 a.m. near Odessa is consistent with comfort and style preferences, not alien smuggling.

[3] *See infra* Part II(C).

suspicious. *Olivares–Pacheco*, 633 F.3d at 405 (concluding that "the number of persons in the truck—six—was neither illegal nor excessive").

Finally, although in the past this Court has accepted testimony that this part of I-20 is an alien-smuggling corridor as supportive of reasonable suspicion, we have more recently given this factor minimal weight on this particular stretch of highway. *Id.* We reasoned that "the overwhelming majority of the traffic on this stretch of I-20 is unquestionably legal and the government has not shown that aliens are more or less likely to use Interstates than back roads." *Id.* The same applies here because, as in *Olivares–Pacheco*, the Government does not point to evidence in this case establishing that alien smugglers are more likely to use Interstates than backroads.

## A.    The Driving Behavior Was Lawful and Safe, Not Suspicious

The majority opinion errs by ascribing suspiciousness to safe and lawful driving behavior. Of course, as the majority opinion notes, "[f]actors that ordinarily constitute innocent behavior may provide a composite picture sufficient to raise reasonable suspicion in the minds of experienced officers." *Olivares–Pacheco*, 633 F.3d at 402 (internal quotation marks omitted).[4] And the Supreme Court has rejected a "divide-and-conquer analysis" for assessing reasonable suspicion, noting that factors which by themselves may be "quite consistent with innocent travel" may collectively amount to reasonable suspicion. *United States v. Arvizu*, 534 U.S. 266, 274–75 (2002) (quoting, in a parenthetical, *United States v. Sokolow*, 490 U.S. 1, 9 (1989)).

But we have also held that facts that are consistent with alien smuggling do not provide reasonable suspicion if those factual conditions also occur even more frequently in the law-abiding public. *United States v. Rangel–Portillo*,

---

[4] *Ante* at 5.

586 F.3d 376, 387 (5th Cir. 2009) (citing *United States v. Chavez–Chavez*, 205 F.3d 145, 148 (5th Cir. 2000)). *Rangel–Portillo* illustrates how innocuous facts considered together as part of the totality of the circumstances may not support reasonable suspicion. There, we confronted a similar scenario; however, the stop occurred much closer to the border—just 500 yards away. *See id.* at 378. As in this case, there, the border patrol agents stopped a Ford Explorer SUV fully loaded with passengers. *Id.* The SUV pulled into a Wal-Mart parking lot in Rio Grande City, Texas that was well-known for alien and drug smuggling. *Id.* The SUV contained three passengers in the back seat, and the driver "made eye contact" with the agent but the backseat passengers "avoided eye contact, were 'stone-faced,' . . . looked straight forward," and "were sweating." *Id.* The district court denied the motion to suppress based on, *inter alia*, the fact that the SUV passengers "failed to converse with one another and sat rigidly," the absence of shopping bags in the SUV, the sweaty appearance of the passengers, and the fact that the rear passengers wore seatbelts. *Id.* at 379. We reversed and vacated the conviction and sentence. *Id.* at 383.

We stated that "there is no rational reason to conclude that law-abiding citizens are less likely to wear their seatbelts or exit a Wal-Mart parking lot sans shopping bags" than someone smuggling aliens or contraband. *Id.* at 381. We rejected the Government's invitation to defer to the agent's expertise in recognizing reasonably suspicious behavior and explained: "Individuals do not shed their constitutional rights with the click of a seatbelt." *Id.*

### 1. Allowing a Car to Pass on the Left Is Not Suspicious

Just as individuals do not shed their constitutional rights with the click of a seatbelt, individuals do not also shed their constitutional rights by changing lanes on a two-lane highway to allow a fast-approaching car to pass

27

on the left.[5] Agent Ramirez testified that he rapidly accelerated his patrol car to catch up to Cervantes. In response to a fast approaching car in the left lane, Cervantes naturally changed lanes to the right lane and slowed down to match speed with a slow moving 18-wheel semi-truck. As in *Rangel–Portillo*, "there is no rational reason to conclude that law-abiding citizens are less likely" to change lanes in this manner than someone smuggling aliens or contraband. *See* 586 F.3d at 381.

### 2. Failing to Acknowledge Horn Honking Does Not Create Reasonable Suspicion in These Circumstances

The border patrol agents also attempt to justify their suspicion by pointing out that, after they pulled into the left lane beside the SUV—boxing in Cervantes with the big-rig truck close in front—they honked their horn six times and Cervantes did not look over.

The horn honking does not contribute to reasonable suspicion. This does not appear to be a technique these agents have found, based on their training and experience, to be indicative of criminal activity afoot. Agent Collier could not say whether it is "unusual for someone to ignore . . . honking of a car." On cross-examination, Agent Collier admitted: "[Border Patrol] have not used [horn honking] a whole bunch. . . . I have not honked the horn very many times." There is also no case law supporting the proposition that failing to heed the honking of an adjacent car's horn is inherently suspicious.[6] Considering

---

[5] Indeed, in Texas, remaining in the left lane is often against the law—supporting reasonable suspicion for a traffic stop. *E.g.*, *Abney v. State*, 394 S.W.3d 542, 548 (Tex. Crim. App. 2013).

[6] In *Orozco*, we observed that the district judge had noted that a border patrol agent honked at the driver as part of the district court's reasons for denying a motion to suppress evidence discovered as a result of a border-patrol stop. 191 F.3d at 582. We suggested that this factor did not contribute to reasonable suspicion, noting that "some of the factors relied on by the trial judge" were inappropriate. *Id.* at 582–83. We nonetheless affirmed the denial

that Cervantes's car was following a 18-wheel semi-truck at speeds approaching 70 miles per hour, boxed in by a border patrol car to his left and the shoulder to his right, the totality of the circumstances indicate that it was reasonable—even advisable—for Cervantes to keep his eyes on the road. Additionally, this Court has repeatedly rejected border patrol agents' conclusions drawn from eye contact when asked to evaluate the reasonableness of a border-patrol stop. *See, e.g.*, *Olivares–Pacheco*, 633 F.3d at 403 ("The avoidance of eye contact . . . is not entitled to any weight."); *Rangel–Portillo*, 586 F.3d at 381 (same); *see also Chavez–Chavez*, 205 F.3d at 149 ("Whether a driver looks at an officer or not should not be accorded much weight.").

### 3. Context Matters in Assessing the Totality of the Circumstances

Deceleration and failure to acknowledge a law-enforcement vehicle may reasonably be suspicious in some circumstances—but the context matters. Courts have agreed with law enforcement that such behavior is suspicious on *secluded* roads, but not necessarily on busy highways. *See, e.g.*, *Arvizu*, 534 U.S. at 275–76 ("We think it quite reasonable that a driver's slowing down, stiffening of posture, and failure to acknowledge a sighted law enforcement officer *might well be unremarkable* in one instance (such as a *busy San Francisco highway*) while quite unusual in another (such as a remote portion of rural southeastern Arizona)." (emphasis added)). Here, there is no evidence in the record that I-20 outside of Midland–Odessa during rush hour on a Monday morning is similar to a remote portion of rural southeastern Arizona. On the contrary, the agents testified that during this time of day, this portion of I-20 experiences heavy traffic from oil-field workers headed to work.

The totality of the circumstances here—a two-lane highway with a fast-

---

of the motion to suppress based on the totality of the circumstances and not on one factor alone. *Id.*

approaching car in the left lane and a slow-moving 18-wheel semi-truck in the right lane—indicate that Cervantes was driving safely and not suspiciously. The majority opinion errs by accepting the border patrol agents' attempt to justify reasonable suspicion based on Cervantes's driving behavior in isolation, even though law-abiding citizens are just as likely to drive as Cervantes did in these circumstances. *See Rangel–Portillo*, 586 F.3d at 381.

**B.    Case Law Illustrates Why Reasonable Suspicion Is Lacking Here**

This case is materially indistinguishable from *Olivares–Pacheco*. As in this case, in *Olivares–Pacheco*, we assessed a border-patrol stop of a vehicle travelling on the same stretch of highway, in the same direction, and at the same time of a weekday. 633 F.3d at 401–02. We explained that "the fact that Olivares–Pacheco was nowhere near the border makes our decision a much easier one. Indeed, of the cases in which the vehicle was stopped far from the border, the articulated reasons for suspicion were far greater than in the instant case." *Id.* at 406, 409 (referring to *Orozco* and *Morales* among other cases). Not only did we reverse the district court's denial of the defendant's motion to suppress, we said the case was not particularly close: "We are satisfied that, if we were to side with the government in this case and affirm the district court's denial of the defendant's motion to suppress, we would be doing so on the *barest articulation of facts that we have ever credited* as constituting reasonable suspicion." *Id.* at 409 (emphasis added).

Moreover, the majority opinion's reliance on *Orozco* and *United States v. Morales*, 191 F.3d 602 (5th Cir. 1999) is misplaced, and the striking differences between those cases and this one illustrate why the agents lacked reasonable suspicion here. In both cases, the circumstances were far more suspicious than this case. In *Orozco*, unlike in this case, the arresting officer testified that he had personally apprehended twenty loads of illegal aliens in the *same area* in

30

the previous five months and knew that a majority of the transporters of aliens passed through this particular stretch of I-20 on weekends between 9 a.m. and 10 a.m.—precisely the same time that the defendant was stopped. 191 F.3d at 582. The agent testified that he "noticed that the truck bed was completely covered by a tarp," and that "the spare tire was placed in the back seat of the truck as if to make room for a large amount of cargo in the bed of the truck," both of which are "common technique[s] employed by smugglers to hide illegal aliens." *Id.* Facts like these are entirely missing in this case. Further, the observed driving behavior in *Orozco* was objectively erratic: "the truck was weaving and bouncing on the road." *Id.* And unlike the agents' vague testimony of "sagging in the rear" in this case, the agents in *Orozco* specifically testified that they observed "that the tires were under inflated—suggesting the truck bed was carrying a heavy cargo." *Id.*

*Morales* is also a far cry from this case. The vehicle in *Morales* bore the hallmarks of an alien-smuggling truck: the agent testified that "[t]he pickup truck had a fiberglass cover over the truck bed," and that "the cover was almost flush with the top of the sides around the bed." 191 F.3d at 605, 607. The border patrol agent further testified that, based on his experience, "he knew that approximately 30 persons could be hidden under the cover." *Id.* at 607. Again, unlike in this case, the driving behavior was objectively erratic: the truck was observed "weaving back and forth across the [lane] line." *Id.* at 605. In contrast to the vague testimony in this case of "sagging," the Government developed record evidence of particular articulable facts to support their suspicion. The border patrol agent in *Morales* testified that he ingeniously positioned himself at a particular spot near a bump in the roadway. *Id.* at 606–07. The agent testified that he had "encountered ways that [smugglers] have tried to hide [a heavy load]. They put 2X4s in the springs and so on and so forth. But when

they do that, the vehicle hits [the bump] solid. It doesn't bounce." *Id.* at 607. The border patrol agent observed this phenomenon and noted that the tires were underinflated, *id.* at 605, and he articulated these observed facts at the suppression hearing. We credited that the agent had drawn "rational inferences from those facts"—that the truck was heavily loaded—and "was able to form the requisite suspicion" to lawfully stop the car. *Id.* at 607.

This case is perhaps a closer one than *Olivares–Pacheco*—due to the agents' observation that the passengers appeared dirty and the SUV was "sagging in the rear."[7] But because of the absence of the kind of observed, articulable facts that we credited in *Morales* and *Orozco* as supporting the credible inference that a truck was heavily loaded with illegal aliens or contraband, I would conclude that *Olivares–Pacheco* is materially indistinguishable from this case and would reverse.

### III. CONCLUSION

For the foregoing reasons, I would hold that the border patrol agents lacked reasonable suspicion to stop Cervantes's car, and I respectfully dissent.

---

[7] *But see Olivares–Pacheco*, 633 F.3d at 401 ("[T]he agents observed that [the truck] was dragging some brush."). Additionally, a flatbed truck has been recognized in our case law as more consistent with alien and drug smuggling than an SUV with passengers visibly seated in the back. *See, e.g.*, *Morales*, 191 F.3d at 605.